MAIN, Judge.
 
 [1]
 

 Esaw Jackson was convicted of three counts of capital murder for killing Pamela Montgomery and Milton Poole III. Jackson was convicted of capital murder for killing Montgomery by shooting her with a rifle fired from a vehicle, § 13A-5-40(a)(18), Ala.Code 1975; capital murder for killing Poole by shooting him with a rifle fired from a vehicle, § 13A-5-40(a)(18), Ala.Code 1975; and of capital murder for killing Montgomery and Poole during one act or pursuant to one scheme or course of conduct, § 13A-5-40(a)(10), Ala.Code 1975. Jackson was also convicted of two counts of attempted murder,
 
 see
 
 §§ 13A-4-2 and 13A-6-2, Ala.Code 1975, for shooting Denarius Montgomery and Shaniece Montgomery. Following the presentation of evidence at the penalty phase of the trial, the jury recommended, by a vote of 10 to 2, that Jackson be sentenced to death. The circuit court conducted a final sentencing hearing on March 16, 2007, and sentenced Jackson to death for his capital-murder convictions. The trial court also sentenced Jackson to consecutive terms of life imprisonment for the two attempted-murder convictions. Jackson filed a motion for a new trial, which was denied by operation of law on May 15, 2007.
 
 See
 
 Rule 24.4, Ala. R.Crim.P. This appeal, which is automatic when a defendant has been sentenced to death, followed.
 
 See
 
 § 13A-5-53(a), Ala. Code 1975.
 
 [2]
 

 The evidence adduced at trial indicated that on February 1, 2006, Pamela Montgomery and Milton Poole III were killed and Shaniece Montgomery and Denarius Montgomery were injured when a gunman opened fire on their automobile.
 
 [3]
 

 Loretta Poole testified that she was the mother of Milton Poole III. She stated that she lived in Ensley until the housing project in which she lived closed, at which time she moved to Smithfield. According to Loretta, the move would have required Milton to change schools, so they decided that he would stay with the Montgomery family so he could remain a student at Ensley High School. Loretta testified that she and Pamela Montgomery were close friends, and that Pamela brought Milton to Loretta’s house every evening so he could get a change of clothes and they could spend some time together, before taking him back to the Montgomery residence.
 

 Loretta further testified she was familiar with Jackson, whom she referred to as “Wolf,” from living in the area. She testified that approximately two weeks before the shooting, she and a group of people were playing cards at her house. She stated that Jackson was outside her house
 
 *203
 
 and got into an argument with one of the people at her house because he believed that person was repeatedly calling his cellular telephone. According to Loretta, she told him nobody in her house was calling him.
 

 Loretta testified that approximately one week after that confrontation, she was walking to the store with another person when they encountered Jackson and Jackson spoke to her friend. Loretta stated:
 

 “And him and her made conversation, and we were still walking along. So they stopped talking, so I looked over at him, and I said — I say, ‘Esaw,’ I said, ‘why you rolling your eyes and acting like that toward me.’ I said, ‘what I done to you?’ He said, “You ain’t did a damn thing to me.’ I said, Well, what’s the problem, then?’ I said — he said, You know what, I ain’t got no problem with you; not for real. I just don’t like your ass.’ I said, ‘You don’t like me.’ He said, ‘No.’ He said, ‘I want you to move.’ I said, You want me to move?’ I said, Well, I am,’ I said, ‘as soon as I can, because my Section Eight [Government Housing Program] came through where we can find it, and I’m trying to wait on my baby.’ He said, You know what? You are going to find something, because I’m going to make you move.’ I said, ‘How you going to make me move?’ He said, ‘I’m going to do something to hurt you.’ I said, Well, like what?’ You know, at first, I thought he was teasing. And I looked at him. I said, ‘Like what?’ He said, ‘I’m going to do something to hurt you.’ And he said, What I’m going to do to hurt you, you ain’t got no choice but to move.’ I said, Why?’ He said, ‘It’s going to hurt you so bad, you tell — you—after he said what I’m going to do,’ he said — (witness crying)_ — You ain’t going to be able to take it,’ he said, ‘because I’m going to come around.’ He said, ‘I’m going to turn around and do something to hurt you. They ain’t going to do a damn thing.’ He said, You going to know I did, and I’m going to know I did.’ He said, ‘I will drive up and down this alley, selling my drugs like I normally do, and when I get to your house,’ he said, ‘when I get to your house — ’ God knows he did — he said, ‘I’m going to sit right there, turn my music up louder, and wait until you to come to the door.’ And he said — ‘And every time you see me, it’s going to make you cry, going to hurt you so bad you ain’t going to have no choice but to move. You going to be looking at me, know what I did and got away with it.’ He told me that.”
 

 (R. 56-57.) She stated that that conversation took place “within a week or two, no longer; wasn’t quite two weeks” before the shooting.
 

 A-Kia Hicks testified that she was walking with Loretta and heard Jackson tell Loretta that “he was going to do something to hurt her and make her move, and he was going to — he was going to come through the — where she stay at, every day, and turn his music up when he get by her apartment, and it wasn’t going to be nothing that she could do about it, and he was going to get away with whatever he was going to do.” (R. 250.)
 

 Melanie Torrence testified that she knew Jackson as “Wolf.” She identified State’s exhibit 22 as a photograph of his automobile. She testified about a confrontation between “Wolf’ and an individual at the Poole residence approximately two weeks before the shooting where “Wolf’ accused the person of calling his cellular telephone. According to Torrence, she saw Jackson on the morning of the shootings, and overheard him say something about his cousin “Pig” buying a gun; Tor-rence stated that Jackson indicated to her
 
 *204
 
 that he and his cousin were going to shoot “a new SK or something — some type of gun like that.” (R. 132.)
 

 The State’s evidence further indicated that on the evening of the shooting, the four victims left Loretta’s residence at approximately 8:30 p.m. to return to the Montgomery residence; Pamela was driving; Shaniece was in the front passenger seat; Denarius was in the backseat on the driver’s side; and Milton was in the backseat on the passenger side.
 

 Denarius Montgomery testified that when they left Loretta’s residence, he noticed Jackson’s automobile parked down the alley, with Jackson in the driver’s seat and two other individuals in the automobile. Denarius testified that as they were driving home, they were stopped at a red light at an intersection. Denarius stated that there was an automobile in front of them and an automobile behind them. He also testified that there was an automobile beside them. According to Denarius, another automobile pulled up beside them. He stated that he heard someone in that automobile yell “Bitch” so he looked over and saw Jackson driving that automobile. Denarius further stated that Jackson was pointing a gun at their automobile and that he opened fire.
 
 [4]
 
 He further testified that they were unable to drive away from the gunfire because other automobiles were also stopped in front of them, behind them, and beside them. According to Denarius, he, his mother, Shaniece, and Milton all exclaimed that they had been hit by gunfire. Denarius further testified that Milton said that “Wolf’ was the one doing the shooting; Denarius also testified that he was aware before Milton’s remark that “Wolf’ was the gunman. Denarius stated that the gunman’s automobile turned right and drove away and that they began to drive to the fire station to get assistance. He testified that his mother drove a few blocks before she lost consciousness near Holy Family Elementary School and that his sister climbed into their mother’s lap and drove the final blocks to the fire station. Denarius stated that he went to the door of the firehouse, but nobody was there, and that the firemen returned from a call a few minutes later and began treating them. According to Denarius, he was shot in the hand and the leg, and he also sustained injuries to his arm from metal fragments. Finally, Denarius identified Jackson at trial as the person referred to as “Wolf.”
 

 On cross-examination, Denarius stated that they had not noticed anyone following them when they left the Poole residence. He further stated that he saw gunfire from the front seat and from the backseat of the gunman’s automobile. According to De-narius, after the gunfire, an automobile that was behind them — not the gunman’s automobile — followed them as far as Holy Family, but then drove away. Denarius testified that he did not recall telling the police that an 18-wheeler was beside them at the light or that he could not identify the shooter.
 

 Shaniece Montgomery testified that she had seen “Wolf’ near Poole’s residence one or two times before. Her testimony regarding the events at the red light and the subsequent drive to the fire station were substantially similar to Denarius’s testimony set out above. She also testified that the automobile looked like a dark Buick Century, but that it was nighttime and she was not sure. She identified State’s exhibit 22 as a photograph of
 
 *205
 
 “Wolfs” automobile. According to Shan-iece, she had been shot four times, and she still had a bullet near her spine that the doctors had not removed. She stated that “Wolf’ and Milton previously had a disagreement in which “Wolf’ had accused Milton of stealing his dog. She identified Jackson at trial as the person she referred to as “Wolf.”
 

 Lisa Davis testified that she worked at the BP gasoline station at the corner of 19th Street and Avenue V in Smithfield, the intersection where the shooting occurred. According to Davis, she heard gunfire and telephoned one of the police officers assigned to that area. She stated that from her vantage point she was unable to identify which automobiles or individuals were involved in the shooting and that she did not see Jackson at the scene.
 

 Officer John Ballard of the Birmingham Police Department testified that he received a call from Davis and responded to the scene. He testified that he began speaking with bystanders at that location when he heard a report on his police radio that the victims were at the fire station, so he proceeded to that location. Officer Ballard testified that he spoke with Denarius and asked him what happened and who did it, Denarius stated in response that ‘Wolf did it.” (R. 36.) Officer Ballard described Denarius’s demeanor as stressed, agitated, or scared.
 

 The State’s evidence indicated that Milton was pronounced dead at the fire station and that Pamela died a short time after being transported to the hospital. Dr. Greg Davis testified that he was the associate coroner and that he was the medical examiner who performed the autopsies on the victims. According to Dr. Davis, Milton had a grazing gunshot wound to his forehead; another gunshot wound where a bullet passed through his right arm, into his chest, right lung, heart, and left lung; and a third gunshot wound where a bullet passed through his right hip and exited through his right buttock. He stated that some of Milton’s injuries were consistent with the bullet striking an intermediate target such as a car door before striking Milton. He further stated that he recovered one projectile from Milton’s body.
 

 Dr. Davis testified that Pamela suffered four gunshot wounds; one struck her diaphragm and liver; one was higher on her torso and more toward her back; one went into her chest, fracturing ribs; and the fourth went into her chest, striking her right lung. He stated that he recovered four projectiles from her body and a fifth projectile from her sweater. According to Dr. Davis, the nature of her injuries would have likely resulted in a loss of consciousness after a few seconds or a minute or so.
 

 Officer Kim McDonald of the Birmingham Police Department testified that she was the evidence technician who photographed the scene. She stated that bullet fragments were recovered from the car and that shell casings and glass were recovered from the scene of the shooting. According to Officer McDonald, there were approximately 10-15 holes or defects that were discernible on the doors or side of the vehicle. She further indicated that the windows had been shot out but there was no way to determine how many bullets had entered the vehicle through the windows. She stated that one of the casings recovered from the scene was a 7.62 x 39 casing for an assault rifle.
 

 Mitch Rector testified that he was a firearm and tool mark examiner for the Birmingham Police Department. According to Rector, the projectiles recovered from the victims’ bodies were consistent with .30 caliber, 7.62 mm projectiles. He indicated that the casing recovered from the roadway scene where the shooting occurred was a .39 caliber, 7.62 mm casing.
 
 *206
 
 He further stated that the casings and projectiles recovered from the scene, the automobile, and the victims’ bodies were similar, but that he could not determine whether they had been fired from the same barrel. He did testify that there were no inconsistencies present that caused him to believe otherwise, only that he was unable to make an affirmative determination because the fragments did not contain sufficient markings to make such a determination.
 

 Brandon Carter testified for the defense that Jackson picked him up from work on the day of the shootings and that he, Milton Edwards, and Jackson were riding around in Jackson’s automobile when they stopped at a red light. According to Carter, they were behind the victims and saw the shooting, and that the gunman was in a blue Toyota Tercel or Corolla automobile. Carter stated that the gunman turned right at the light, but that Jackson followed the victims’ automobile for a couple of blocks until the victims pulled into Holy Family Elementary School. Carter stated that Jackson took him home. He conceded that he told the police the following morning that he had not been in the automobile with Jackson; according to Carter, he did not want to get involved. He identified State’s exhibit 22 as a photograph of Jackson’s automobile.
 

 Barbara Jackson, Jackson’s mother, testified. She stated that Jackson left her house around 4:40 p.m. on the day of the murders and returned at approximately 9:00 p.m. that same evening. She further testified that when he returned, Jackson said, “Mama, we witnessed a shooting.” (R. 281.) She stated that Jackson told her that Milton Edwards and Brandon Carter were in the car with him, and that there was no further conversation about the shooting. She testified that approximately 15 minutes later a “repo truck” came by the house and that she believed Carter got into the truck and left. Finally, she stated that Jackson took Edwards home sometime between 11:30 p.m. and 11:45 p.m.
 

 I.
 

 Jackson first argues that the penalty of death by lethal injection is cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution. In his brief, Jackson presented only a general challenge to the constitutionality of the death penalty. At oral arguments, Jackson indicated that he had an argument prepared with regard to this issue, but conceded that the recent decision by a majority of the United States Supreme Court in
 
 Baze v. Rees,
 
 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), was adverse to his position. He asserted that the dissent filed by Justice Ginsburg, and joined by Justice Souter, was supportive of his position with regard to the protocol, procedure, and administration of the lethal injection as a means of effectuating the death penalty.
 

 This issue has been addressed by recent opinions from this Court. In
 
 Saunders v. State,
 
 10 So.3d 53 (Ala.Crim.App.2007), this Court stated:
 

 “The United States Supreme Court has held that the imposition of the death penalty as a sentence for capital murder is not per se unconstitutional. See
 
 Gregg v. Georgia,
 
 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In addition, Alabama’s capital-murder statute has been upheld against a variety of constitutional challenges. See, e.g.,
 
 Clark v. State,
 
 896 So.2d 584 (Ala.Crim.App.2000), and cases cited therein. This Court has also held that lethal injection does not constitute per se cruel and unusual punishment. See, e.g.,
 
 McNabb v. State,
 
 991 So.2d 313 (Ala.Crim.App.2007), and cases cited therein. There
 
 *207
 
 fore, Saunders’s general claim that the death penalty constitutes cruel and unusual punishment is meritless.”
 

 10 So.3d at 111. Further, as this Court recently stated:
 

 “‘[C]ourts have repeatedly held that the death penalty is not per se cruel and unusual punishment and that electrocution is not a cruel and unusual method of capital punishment.
 
 See Zant v. Stephens,
 
 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983);
 
 Proffitt v. Florida,
 
 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976);
 
 Furman v. Georgia,
 
 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972);
 
 Williams v. State,
 
 627 So.2d 985 (Ala.Crim.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994);
 
 Boykin v. State,
 
 281 Ala. 659, 207 So.2d 412 (1968), rev’d on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).’
 

 “Wynn v. State,
 
 804 So.2d 1122, 1148 (Ala.Crim.App.2000). Also, in
 
 Ex parte Belisle,
 
 11 So.3d 323, 339 (Ala.2008), the Alabama Supreme Court addressed the United States Supreme Court’s decision in
 
 Baze v. Rees,
 
 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), and ‘eon-clude[d] that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.’ Therefore, Newton’s argument is without merit.”
 

 Newton v. State,
 
 [Ms. CR-05-1517, October 2, 2009] — So.3d -, - (Ala.Crim.App.2009).
 
 See also Lewis v. State,
 
 57 So.3d 807 (Ala.Crim.App.2009). Jackson has presented no arguments that support a different conclusion, nor does our research reveal any such basis. Therefore, Jackson is not entitled to any relief on this claim.
 

 II.
 

 Jackson also argues that charging him with three counts of capital murder was multiplicitous and that his resulting convictions and sentence of death for all three counts violated principles of double jeopardy.
 
 [5]
 

 Similar arguments have been addressed and found meritless by the appellate courts of this State. In
 
 Ex parte Peraita,
 
 897 So.2d 1227 (Ala.2004), the Alabama Supreme Court stated:
 

 “Peraita argues that both state and federal law prohibit a state from subjecting a defendant to double jeopardy, and that the indictment charging him sought to exact ‘multiple prosecutions’ for the same offense.
 
 Blockburger v. United States,
 
 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).
 

 “The
 
 Blockburger
 
 test is aimed at, among other things, ‘ “multiple
 
 punishments
 
 imposed in a single prosecution.”’
 
 Grady v. Corbin,
 
 495 U.S. 508, 516-17, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) (quoting
 
 Garrett v. United States,
 
 471 U.S. 773, 778, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985)). Peraita argues that conviction of two counts of capital murder for the killing of a single person constitutes such multiple punishment. He cites
 
 Meyer v. State,
 
 575 So.2d 1212 (Ala.Crim.App.1990), and
 
 Ex parte Rice,
 
 766 So.2d 143 (Ala.1999), for the proposition that multiple charges from the same
 
 *208
 
 statute violate double-jeopardy principles.
 

 “The defendant in
 
 Meyer
 
 was charged with capital murder and indicted for three counts of capital murder for the killing of one person. His indictment alleged that he committed the murder while committing robbery of three separate items. The Court of Criminal Appeals held that these three allegations were merely three ‘ “alternative methods of proving the same crime, and therefore, did not constitute separate offenses.” ’
 
 Meyer,
 
 575 So.2d at 1217 (quoting
 
 Sisson v. State,
 
 528 So.2d 1159, 1162 (Ala.1988)).
 

 “In
 
 Rice,
 
 the defendant was charged with two counts of capital murder for the killing of one individual during a robbery and a kidnapping; he was convicted of two counts of ‘the crime of murder’ under Ala.Code 1975, § 13A-6-2(a)(3), specifically the lesser-included offense of felony murder. This Court held that, much like
 
 Meyer
 
 and
 
 Sisson,
 
 each count in
 
 Rice
 
 was an alternative method of proving but a single crime.
 

 “In contrast to
 
 Meyer
 
 and
 
 Rice,
 
 the two capital-murder charges against Per-aita are separate offenses. Each count of capital murder is a separate offense, as shown by the beginning of the statute defining capital offenses, which provides, ‘The following are capital
 
 offenses.’
 
 Ala. Code 1975, § 13A-5-40(a). So long as each count of the crime concerns a separate offense, as opposed to a separate method of proving that offense, the double-jeopardy provision of the United States Constitution is not implicated. We hold that Peraita’s right to be free from double jeopardy was not violated by his having been tried and convicted of two counts of capital murder for the killing of one individual.”
 

 897 So.2d at 1236.
 
 See also Lewis v. State,
 
 57 So.3d 807 (Ala.Crim.App.2009);
 
 Brooks v. State,
 
 973 So.2d 380 (Ala.Crim.App.2007); and
 
 Williams v. State,
 
 710 So.2d 1276 (Ala.Crim.App.1996).
 

 Here, each capital-murder conviction required an element not required in the other convictions. One count required that Jackson intentionally killed Pamela Montgomery by shooting her while he was in an automobile; one count required that Jackson intentionally killed Milton Poole III by shooting him while he was in an automobile; and one count required that Jackson intentionally killed Montgomery and Poole by one act or pursuant to one scheme or course of conduct. Thus, his argument is without merit, and Jackson is not entitled to any relief on this claim.
 

 III.
 

 Finally, Rule 45A, Ala.R.App.P., requires this Court to review the record for any plain error with respect to Jackson’s capital-murder convictions.
 

 Rule 45A, Ala.R.App.P., provides:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 “ ‘Plain error is defined as error that has “adversely affected the substantial right of the appellant.” ’ ”
 
 Ex parte Brown,
 
 11 So.3d 933, 935 (Ala.2008), quoting
 
 Hall v. State,
 
 820 So.2d 113, 121 (Ala.Crim.App.1999). It is error “ ‘ “so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.” ’ ”
 
 Saunders v. State,
 
 10 So.3d 53, 74 (Ala.Crim.App.2007), quoting
 
 *209
 

 Ex parte Womack,
 
 435 So.2d 766, 769 (Ala.1983), quoting in turn
 
 United States v. Chaney,
 
 662 F.2d 1148, 1152 (5th Cir.1981).
 

 “ ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is “particularly egregious” and if it “seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Crim.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Crim.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).’
 

 “Hall v. State,
 
 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001). Although the failure to object will not preclude our review, it will weigh against any claim of prejudice. See
 
 Dill v. State,
 
 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).”
 

 Sale v. State,
 
 8 So.3d 330, 345 (Ala.Crim.App.2008).
 

 We find no plain error or defect in the proceedings during the guilt phase of Jackson’s trial.
 

 Further, § 13A-5-53, Ala.Code 1975, requires that this Court review the propriety of the death sentence imposed in this case.
 

 “This review shall include the determination of whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court’s findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in the case.”
 

 § 13A-5-53(a), Ala.Code 1975. In determining whether death was the appropriate sentence in this case, we must determine: (1) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating circumstances and mitigating circumstances indicates that death is the proper sentence; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in other similar cases, considering both the crime and the defendant.
 
 See
 
 § 13A-5-53(b), Ala.Code 1975.
 

 Here, the trial court conducted a separate sentencing hearing in accordance with §§ 13A-5^45 and -46, Ala.Code 1975. After hearing evidence of the aggravating circumstances and mitigating circumstances and being instructed on the applicable law and its role and duties in the sentencing process, the jury recommended, by a vote of 10 to 2, that Jackson be sentenced to death. The trial court, in accordance with § 13A-5-47, Ala.Code 1975, ordered and received a presentence investigation report and conducted another hearing to aid it in determining whether to sentence Jackson to life imprisonment without parole or to death. In its sentencing order, the trial court entered specific, written findings as to each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975; the nonexistence of each of
 
 *210
 
 the mitigating circumstances enumerated in § 13A-5-51, Ala.Code 1975; and the nonstatutory mitigating circumstances it found to exist under § 18A-5-52, Ala.Code 1975. The trial court’s written sentencing order also contained written findings of fact summarizing the crime and Jackson’s participation in it.
 

 The trial court found the existence of two statutory aggravating circumstances: (1) that Jackson knowingly created a great risk of death to many persons,
 
 see
 
 13A-5-49(3), Ala.Code 1975; and (2) that Jackson intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct,
 
 see
 
 § 13A-5-49(9), Ala.Code 1975. The trial court found no statutory mitigating circumstances in § 13A-5-51, Ala.Code 1975. The trial court found and considered as nonstatutory mitigating circumstances:
 

 “1. [Jackson] is a great father to his son whom he loves and provides for.
 

 “2. [Jackson] is good hearted person and everyone in the neighborhood really loves him. [Jackson] treats his baby’s mama well and has never been violent towards her. He also treats the daughter of his baby’s mama well as if she were his own child.
 

 “3. [Jackson] gives kids money in front of the mission.
 

 “4. [Jackson] drives his elderly neighbor to the store.
 

 “5. [Jackson] gave people money and told them not to worry, about paying it back.
 

 “6. [Jackson] has been very helpful to his mother.
 

 “7. [Jackson’s] mother, his baby’s mama, his sister and friends all love him. He has been a good provider to his baby’s mama.
 

 “8. [Jackson] gets a disability check for an alleged physical disability, and gives money to those who need it.
 

 “9. [Jackson] never knew his real father, and had a 9th grade education.”
 

 (C. 49.)
 

 The trial court’s sentencing order reflects the following:
 

 “In determining the sentences herein, the Court has not been influenced by any references or expressions of community sentiment that have been made. Moreover, the Court has not considered, and has not been influenced by, any improper matters that may be contained in the pre-sentence report. Upon considering and weighing the aggravating circumstances against the mitigating circumstances, the Court finds that the aggravating circumstances greatly outweigh the mitigating circumstances. The Court considered the evidence presented by [Jackson] at the sentencing hearing, where the jury participated, as evidence of nonstatutory mitigating factors. Considering the fact that [Jackson] had several family members testify on his behalf all of whom appeared to genuinely love and care for [Jackson], it would be a stretch to find that [Jackson’s] background was one of total deprivation. Having weighed the statutory aggravating circumstances against all of the nonstatutory mitigating circumstances, and having given careful consideration and substantial weight to the evidence and the jury’s advisory recommendation, the Court finds that the aggravating circumstances in these cases outweigh the mitigating circumstances and that the punishment should be death, in accordance with the jury’s recommendation of ten (10) for death and two (2) for life without parole, with re
 
 *211
 
 spect to each conviction of Capital Murder as charged in the indictments.”
 

 (C. 50.)
 

 Pursuant to the requirements of § 13A-5-53(a), we have reviewed the record of the sentencing proceedings and find no error, plain or otherwise, adversely affecting Jackson’s rights. We find no evidence that the sentence of death was imposed under the influence of any passion, prejudice, or other arbitrary factor. The trial court’s findings concerning the aggravating circumstances and mitigating circumstances are supported by the record. Further, this Court has independently weighed the aggravating circumstances against the mitigating circumstances, and we concur with the trial court’s conclusion that the aggravating circumstances outweigh the mitigating circumstances, and we agree that death was the proper sentence in this case. Finally, considering the crime committed and considering Jackson, we find that the sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in other similar cases.
 
 See McGriff v. State,
 
 908 So.2d 961 (Ala.Crim.App.2000), reversed on other grounds, 908 So.2d 1024 (Ala.2004) (upholding death sentence for murder by use of a deadly weapon fired from a motor vehicle);
 
 Lewis v. State,
 
 57 So.3d 807 (Ala.Crim.App.2009) (upholding death penalty for murder by use of a deadly weapon fired from a motor vehicle);
 
 Mills v. State,
 
 62 So.3d 553 (Ala.Crim.App.2008) (opinion on return to remand) (upholding death penalty for murder of two or more persons); and
 
 Brownfield v. State,
 
 44 So.3d 1 (Ala.Crim.App.2007) (upholding death penalty for murder of two or more persons).
 

 For the foregoing reasons, Jackson’s capital-murder convictions and his sentence of death are hereby affirmed. Jackson’s convictions and consecutive sentences of life imprisonment for two counts of attempted murder are also affirmed.
 

 AFFIRMED.
 

 WISE, P.J., and WELCH, WINDOM, and KELLUM, JJ., concur.
 

 [1]
 

 .This case was originally assigned to another judge on this Court; it was reassigned to Judge Main on May 15, 2009. Although he was not a member of the Court on June 24, 2008, when oral arguments were conducted, he has reviewed the tape of oral arguments.
 

 [2]
 

 . Jackson also filed a written notice of appeal with regard to each of his convictions, including the attempted-murder convictions.
 

 [3]
 

 . A number of witnesses referred to Milton Poole III as "Three." For purposes of this opinion, this Court will refer to him as "Milton.”
 

 [4]
 

 . Denarius testified that he also saw what looked to be another gun pointed at them from the backseat of Jackson’s automobile.
 

 [5]
 

 . In his brief, Jackson cites legal authority derived from
 
 Blockburger v. United States,
 
 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). At oral argument, Jackson further asserted that the principles espoused in
 
 Sanabria v. United States,
 
 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978),
 
 Ex parte Sisson,
 
 528 So.2d 1159 (Ala.1988),
 
 Ex parte Rice,
 
 766 So.2d 143 (Ala.1999), and
 
 Ex parte Robey,
 
 920 So.2d 1069 (Ala.2004), supported his conclusion.