WOODALL, Justice.
 

 Esaw Jackson was convicted of three counts of capital murder for (1) killing Pamela Montgomery by shooting her with a rifle fired from a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975; (2) killing Milton Poole III by shooting him with a rifle fired from a vehicle, see § 13A-5-40(a)(18), Ala. Code 1975; and (3) killing Montgomery and Poole during one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975. He
 
 *213
 
 was also convicted of two counts of attempted murder for shooting Denaris
 
 [1]
 
 Montgomery and Shanieee Montgomery.
 

 The jury recommended, by a vote of 10-2, that Jackson be sentenced to death for the capital-murder convictions. After a sentencing hearing, the trial court sentenced Jackson to death. The trial court also sentenced him to consecutive terms of life imprisonment for the two attempted-murder convictions. After Jackson’s motion for a new trial was denied by operation of law, he appealed.
 

 The Court of Criminal Appeals affirmed Jackson’s convictions and sentences.
 
 Jackson v. State,
 
 68 So.3d 201 (Ala.Crim. App.2009). Jackson raised only two issues on appeal to the Court of Criminal Appeals, both of which related solely to his capital-murder convictions. The Court of Criminal Appeals rejected his argument “that the penalty of death by lethal injection is cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.”
 
 Jackson,
 
 68 So.3d at 206. That court also rejected his argument “that charging him with three counts of capital murder was multiplicitous and that his resulting convictions and sentence of death for all three counts violated principles of double jeopardy.”
 
 Jackson,
 
 68 So.3d at 207. Further, as required by Rule 45A, Ala. R.App. P., the Court of Criminal Appeals reviewed the record for any plain error or defect in the proceeding and found none during either the guilt phase or the sentencing phase of Jackson’s trial. After the Court of Criminal Appeals overruled his application for a rehearing, Jackson, through new counsel, petitioned this Court for certiorari review of the capital-murder convictions and sentences of death that the Court of Criminal Appeals affirmed.
 

 Rule 39(a)(2)(A), Ala. R.App. P., provides that, in a death-penalty case, “a petition for writ of certiorari will ... be considered from a decision failing to recognize as prejudicial any plain error or defect in the proceeding under review whether or not the error or defect was brought to the attention of the trial court or the Court of Criminal Appeals.” In his petition for cer-tiorari review, Jackson presents several issues that, according to him, warrant plain-error review. See Rule 39(a)(2)(B), Ala. R.App. P. We granted his petition to consider four of those issues.
 

 “Plain error is defined as error that has ‘adversely affected the substantial right of the appellant.’ ”
 
 Hall v. State,
 
 820 So.2d 113, 121 (Ala.Crim.App.1999) (quoting Rule 45A, Ala. R.App. P.), aff'd, 820 So.2d 152 (Ala.2001). “Plain error is ‘error so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.’”
 
 Ex parte Walker,
 
 972 So.2d 737, 742 (Ala.2007) (quoting
 
 Ex parte Trawick,
 
 698 So.2d 162, 167 (Ala.1997)). “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.”
 
 Hyde v. State,
 
 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). Plain-error review “is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ”
 
 United States v. Young,
 
 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (quoting
 
 United States v. Frady,
 
 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). “Although the failure to object will not preclude [plain-error] review, it will weigh against any claim of preju
 
 *214
 
 dice.”
 
 Sale v. State,
 
 8 So.3d 380, 345 (Ala.Crim.App.2008).
 

 In its opinion, the Court of Criminal Appeals summarized much of the trial testimony, and there is no need to repeat most of that discussion. On February 1, 2006, Pamela Montgomery was operating her automobile; in the vehicle with her were her children, 17-year-old Denaris and 21-year-old Shaniece, as well as 16-year-old Milton Poole III, a family friend. While Pamela was stopped at an intersection, someone fired many rounds from an assault rifle into her vehicle, killing Pamela and Milton and injuring Denaris and Shan-iece. Denaris testified that he had seen Jackson drive up beside his mother’s car and open fire. Shaniece was not able to identify a shooter. Brandon Carter, a defense witness, testified that he was in Jackson’s vehicle at the time of the shooting and that the shots were fired from another vehicle, not by Jackson.
 

 Milton’s mother was Loretta Poole. She was acquainted with Jackson, who lived in the same area she lived in. Loretta testified, as stated in
 
 Jackson,
 
 68 So.3d at 202, that, approximately two weeks before the shooting, Jackson had told her that he did not like her and that he was going to make her move from the area by “hurt[ing] [her] so bad” that she “ain’t going to have no choice but to move.” However, the Court of Criminal Appeals’ opinion does not address all Loretta’s testimony concerning what the State describes as Jackson’s “vague and cryptic threat.” State’s brief, at 21. Some of Jackson’s claims of plain error relate to the testimony not addressed by the Court of Criminal Appeals.
 

 During the guilt phase of Jackson’s trial, Loretta, on direct examination, gave the following testimony:
 

 “Q. [PROSECUTOR:] Okay.
 

 “A. [LORETTA:] But I thought he was talking about doing something to ‘me.’ I asked still, ‘What you going to do?’ He said, ‘Never f- mind what I’m going to do.’ He said, ‘Because what I’m going to do,’ he said, ‘you know, you ain’t going to be able to take it.’
 

 “Q. Okay.
 

 “A. And he don’t lie. He didn’t lie.
 
 I ain’t able to take it.
 
 (witness crying)
 

 “Q. Okay.
 

 “A.
 
 He killed my child.
 

 “Q. Okay. Hang on. Hang on. Hang on. Just take a minute. Take a minute. Take a minute.
 

 “A. Oh, God help me.
 

 “Q. Take an easy breath.
 

 “A. Help me, Jesus. Help me, God.
 

 “Q. Breathe.
 

 “A. Help me, Lord Jesus, Jehovah; please help me.
 

 “Q. Ma’am — okay?
 

 “A. Thank you, Jesus.
 

 “Q. Let me ask you a question. You okay? You okay?
 

 “A.
 
 I never be okay anymore.
 

 “Q. All right. Well, let me ask you one more question, and I will be done. Okay?
 

 “A. Okay.
 

 “Q. Okay?
 

 “A. Go ahead.
 

 “Q. All right. About how long before [Milton] was killed did that conversation take place?
 

 “A. Within a week or two, no longer; wasn’t quite two weeks.
 

 “Q. Okay.
 

 “A. It was early one morning. I won’t forget it.
 

 
 *215
 
 “Q. Okay.
 

 “A. He was riding along the side, and he started coming by the house and stuff, flashing a whole lot of l’s in the windows, and you know, we be out in the yard, and he just come back peeking (sic), doing the peeking things (sic), you know.
 

 “Q. Okay.
 

 “A. Peeking things. And I paid no attention. I thought he was talking about doing something to me. But then when he said I wasn’t going to be able to take it,
 
 I didn’t have no idea he was talking about killing my child, until the night he did it,
 
 when my child told me—
 

 “[DEFENSE COUNSEL]: We are going to object to this, non-responsive; not been a question asked in fifteen minutes.
 

 “[PROSECUTOR]: Hold on.
 

 “THE WITNESS: Because it wasn’t your child killed. It wasn’t your child killed, (witness crying)
 

 “THE COURT: Hang on, ma’am. Listen to the question.
 

 “THE WITNESS: Oh,
 
 it hurts so bad.
 

 “THE COURT: I know it does. Just hang on just for a second. Just close your eyes and think about Jesus for a second. Just hang on just a second.”
 

 (Emphasis added; parenthetical language original.) This emotional, mostly nonre-sponsive testimony forms the basis for some of Jackson’s claims of plain error.
 

 Jackson correctly observes that “Loretta Poole ... was permitted to provide extremely emotional testimony regarding her opinion of [Jackson’s] guilt, despite the fact that she had no personal knowledge of the identity of the shooters.” Jackson’s brief, at 8. Loretta was not at the scene of the shooting; nevertheless, she twice expressed her opinion that Jackson had killed her son. Such testimony from a lay witness was clearly inadmissible. Rule 701, Ala. R. Evid., provides, in pertinent part, that a lay “witness’s testimony in the form of opinions or inferences is limited to those opinions and inferences which are ... rationally based on the perception of the witness.” “The Advisory Committee’s Notes on [this] portion of Rule 701 ... indicate that ‘[t]his is no more than a restatement of the “firsthand knowledge rule,” found in Ala. R. Evid. 602, tailored to opinions. No lay witness may give an opinion based upon facts that the witness did not actually observe.’ ”
 
 Musgrove Constr., Inc. v. Malley,
 
 912 So.2d 227, 239-40 (Ala.Civ.App.2003). See also
 
 Lewis v. State,
 
 889 So.2d 623, 646 (Ala.Crim.App.2003).
 
 [2]
 

 Jackson argues that Loretta’s “extraordinarily prejudicial testimony was improper because it went to the
 
 ultimate issue
 
 in this case — whether [he] had shot ... Milton and the others in the car with him.” Jackson’s brief, at 8 (emphasis added). Although the only disputed issue at trial was whether Jackson had fired a weapon into the vehicle occupied by the victims, Loretta’s statements were inadmissible, regardless of whether they are properly characterized as going to the ultimate issue to be decided by the jury. Rule 704, Ala. R. Evid., states: “Testimony in the form of an opinion or inference
 
 otherwise admissible
 
 is to be excluded if it embraces an ultimate issue to be decided by the trier of fact.” (Emphasis added.) As previously discussed, Loretta’s opinions were not “otherwise admissible,” because they did not satisfy the requirements of
 
 *216
 
 Rule 701. “If the witness has no personal or firsthand knowledge, then lay opinion should be excluded whether or not it concerns an ultimate issue.” Charles W. Gamble & Robert J. Goodwin,
 
 McElroy’s Alabama Evidence
 
 § 127.01(6) at 720 (6th ed. 2009) (footnote omitted). Loretta, who was not present at the crime scene, should not have been allowed to testify that it was Jackson who had killed her son. Under the facts of this case, the significance of the issue embraced within Loretta’s opinions is relevant to whether a substantial right of Jackson’s has been affected, but not to the admissibility of the opinion.
 

 According to the State, “[t]here cannot be a serious argument that the jury would have perceived [Loretta’s] emotional outburst as preempting [its] role as fact finder.” State’s brief, at 22. However, during his guilt-phase closing argument, the prosecutor sought to benefit from Loretta’s inadmissible conclusions. He stated: “Loretta Poole knows that Esaw Jackson did it. I guarantee you she’s convinced beyond a reasonable doubt that man killed her son. I guarantee she is convinced beyond a reasonable doubt that Esaw Jackson killed Pam Montgomery.” It was, of course, the jury’s responsibility to determine whether the State had carried its burden to prove that Jackson had intentionally killed the victims, and Loretta’s inadmissible opinion testimony concerning that issue should not have been before the jury as it fulfilled that responsibility. Indeed, “[t]he admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases.”
 
 Booth v. Maryland,
 
 482 U.S. 496, 508-09, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), overruled in nonrelevant part,
 
 Payne v. Tennessee,
 
 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).
 

 The State argues that any error in admitting Loretta’s testimony giving her opinion that Jackson killed her son “was harmless error given the overwhelming evidence of guilt presented at Jackson’s trial.” State’s brief, at 27. However, “the proper inquiry here is not whether evidence of the defendant’s guilt is overwhelming but, instead, whether a substantial right of the defendant has or probably has been adversely affected.”
 
 Ex parte Lowe,
 
 514 So.2d 1049, 1050 (Ala.1987). At any rate, the evidence of Jackson’s guilt was far short of overwhelming. Indeed, during his closing argument, the prosecutor acknowledged that the “whole case, quite honestly, boils down to Denaris,” the only eyewitness to identify Jackson as the shooter. There was no physical evidence to connect Jackson to the shooting, and the State never found the murder weapon.
 
 [3]
 

 The State argues that “[ejvidence was presented that Jackson planned and carried out this shooting attack after he had instigated several altercations with Loretta Poole, Milton’s mother, and her acquaintances.” State’s brief, at 28. As previously discussed, there was evidence indicating that Jackson made what the State describes as “cryptic threats” toward Loretta
 
 *217
 
 approximately two weeks before the shooting. However, according to Loretta, Jackson merely harassed her in the days that followed the threats, doing her no physical harm. Before Jackson’s threats toward Loretta, he had argued with someone who happened to be at Loretta’s house at the time, but there was no physical violence involved. According to Shaniece Montgomery, Jackson had, at some unspecified time, accused Milton of stealing Jackson’s dog, but there is no evidence concerning the outcome of any dispute regarding that accusation. Finally, although there was testimony that Jackson had been seen both driving and parked near Loretta’s residence on the night of the shooting, such activities were, by Loretta’s own admission, not unusual.
 

 In her testimony, Loretta did more than simply express her opinion as to Jackson’s guilt. She also, while crying, described how badly her son’s death had affected her: “I ain’t able to take it”; “I never be okay anymore”; “it hurts so bad.” As Jackson argues, these victim-impact statements were not relevant to any material issue during the guilt phase of Jackson’s trial and, therefore, were not admissible.
 
 Ex parte Crymes,
 
 630 So.2d 125, 126 (Ala.1993).
 
 [4]
 
 “[T]he introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law.”
 
 Ex parte Rieber,
 
 663 So.2d 999, 1006 (Ala.1995). However, “a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.” 663 So.2d at 1005.
 

 Jackson argues that “the highly emotional testimony of [Loretta], who also expressed her personal belief that Mr. Jackson was the shooter,” created a situation where “the jury could not have been able to objectively evaluate the evidence against [him] after hearing how deeply the incident had impacted the victim’s family.” Jackson’s brief, at 18. “Indeed, [according to Jackson,] it is unlikely that any person sitting in the courtroom would not have been moved by [Loretta’s] deep anguish over the loss of her son. The prejudice was even further heightened because [Loretta] also expressed her opinion that Mr. Jackson was guilty.” Jackson’s reply brief, at 10.
 

 The State, on the other hand, argues that the error in admitting the victim-impact evidence “does not rise to the level of plain error,” because, according to the State, “it is implausible that the limited testimony cited by Jackson had any effect on the jury’s determination of [his] guilt, especially in light of the trial court’s thorough instructions” concerning the jury’s responsibility “to determine, based on all of the evidence, whether ... the prosecutor had established Jackson’s guilt beyond a reasonable doubt.” State’s brief, at 32. However, given the highly emotional nature of Loretta’s testimony, as well as the prosecutor’s “guarantee [to the jury] that [Loretta was] convinced beyond a reasonable doubt” that Jackson committed the murders, we cannot say that “the record conclusively shows that the admission of the victim impact evidence ... did not affect the outcome of the trial or otherwise
 
 *218
 
 prejudice a substantial right of the defendant.”
 
 Rieber,
 
 668 So.2d at 1005.
 

 We have not ignored the cases relied upon by the State. However, the facts of this case distinguish it from those cases. In
 
 Rieber,
 
 the obviously unemotional victim-impact testimony by the victim’s husband during the guilt phase of the trial concerning “[the victim’s] children, their ages, and the status of their custody after the murder” was not infected with any other inadmissible testimony. 663 So.2d at 1005. In
 
 Crymes,
 
 which was not a death-penalty case, the only issue preserved for review was whether the admission of testimony concerning the ages of the victim’s children was reversible error. The Court concluded that, “[e]ven though the testimony was inadmissible, the trial court’s error in admitting it was harmless in light of the prior testimony, to which Crymes did not object, regarding how long the witness had been married to the victim and how many children they had, and in light of the overwhelming evidence of Crymes’s guilt.” 630 So.2d at 127. Finally, in
 
 Hodges v. State,
 
 856 So.2d 875, 920 (Ala.Crim.App.2001), the evidence in question “was not [even] offered as victim-impact evidence.”
 

 For these reasons, we conclude that Loretta’s expression of anguish and the inseparable inadmissible opinion and victim-impact testimony thereby communicated to the jury rise to the level of plain error, because the errors reflected by the admission of that testimony affected Jackson’s substantial rights and likely had an unfair prejudicial impact on the jury’s deliberations. Therefore, the judgment of the Court of Criminal Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 [5]
 

 REVERSED AND REMANDED.
 

 COBB, C.J., and LYONS, STUART, SMITH, PARKER, MURDOCK, and SHAW, JJ., concur.
 

 BOLIN, J., concurs in the result.
 

 [1]
 

 . This victim’s name is spelled “Denarius” in the Court of Criminal Appeals’ opinion.
 

 [2]
 

 . Although Jackson specifically addressed Rule 701 in his petition and in his brief, the State has made no attempt to explain how Loretta's opinions regarding Jackson’s guilt can be reconciled with the firsthand-knowledge requirement of that rule.
 

 [3]
 

 . Bullet fragments removed from the bodies of Pamela Montgomery and Milton Poole were determined to have been fired from an AK-47 or a SKS (the semiautomatic version of an AK-47) assault rifle. The State argues that "[t]here was evidence that Jackson was in possession of an assault rifle on the day of the shooting.” State’s brief, at 29. However, our review of the record finds no support for this statement. Brandon Carter denied seeing a weapon in Jackson’s vehicle, and, as Jackson points out, "the only evidence that anyone ever possessed an assault rifle was testimony that Mr. Jackson’s cousin, not Mr. Jackson, had said he bought a 'SK' a couple weeks before the incident, not the same day.” Jackson’s reply brief, at 5 (citations to reporter’s transcript omitted).
 

 [4]
 

 . The State does not argue that Loretta’s statements were not improper victim-impact evidence or that the statements were relevant to any disputed issue at the guilt stage of Jackson’s trial.
 

 [5]
 

 . It is not necessary for us to consider Jackson’s other claims of plain error in the guilt and sentencing phases of his trial. Also, as previously indicated, there is no issue before this Court concerning Jackson’s attempted-murder convictions.