WELCH, Judge.
Esaw[1] Jackson (“Jackson”) was initially convicted in 2007 of three counts of capital murder for killing Pamela Montgomery (“Pamela”) and Milton Poole III (“Milton”). Following Jackson’s first trial, he was convicted of murder made capital because he killed Pamela by shooting her with a rifle fired from a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975; murder made capital because he killed Milton by shooting him with a rifle fired from a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975; and of murder made capital because he killed Pamela and Milton during one act or pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala.Code 1975. Jackson was also convicted of two counts of attempted murder, see §§ 13A-4-2 and 13A-6-2, Ala.Code 1975, for shooting Denaris Montgomery and Shaniece Montgomery. Jackson was sentenced to death for his capital-murders convictions and to life imprisonment for the attempted-murder convictions.
Jackson appealed and this Court affirmed his convictions, and sentences in Jackson v. State, 68 So.3d 201 (Ala.Crim.App.2009). In Ex parte Jackson, 68 So.3d 211 (Ala.2010), the Alabama Supreme Court reversed our judgment and remanded Jackson’s case. In accordance with that opinion we remanded Jackson’s case to the circuit court for a new trial. Jackson v. State, 68 So.3d 218 (Ala.Crim.App.2010).
Jackson’s second trial began on November 28, 2011. At the conclusion of the guilt phase, the jury convicted Jackson on all counts.[2] Following the presentation of evidence at the penalty phase of the trial the jury recommended, by a vote of 10 to 2, that Jackson be sentenced to death for the capital-murder convictions.
The probation officer included in the presentence report a notation that “Esaw Jackson seemed to have mental retardation; he would not elaborate as to why he receives disability, nor ... did he have the capability to answer my questions in a competent manner.” (C. 310.) The circuit court ordered that a psychological evaluation of Jackson be conducted by Dr. Glen King (“Dr. King”). Following the completion of Dr. King’s report, the circuit court held a combined sentencing and Atkins[3] hearing during which Dr. King testified that he concluded that Jackson was mentally retarded and that Jackson had an overall IQ of 56.
In sentencing Jackson, the circuit court found “Dr. King’s testimony and findings to be quite credible” and sentenced Jackson to life imprisonment without the possibility of parole on each count of capital murder and life imprisonment on each count of attempted murder. All the sentences are to be served consecutively with each other. (C. 56.) Jackson appealed.

Facts

The evidence admitted at trial indicated that, in the middle of January 2006, Jackson’s friend, Melanie Torrence, was riding with Jackson in his car while Jackson was talking on his two-way radio with someone *916 named “Pig.” (R. 362.) Pig said that he had bought “an SK” gun. (R. 363.)
Also in January 2006, Loretta Poole (“Loretta”), Milton’s mother, was walking near a store with A-Kia Hicks when Jackson pulled up in his car. Loretta asked Jackson, who had been driving past her apartment waiving money and guns, why he had been acting that way. Jackson replied:
‘You ain’t did nothing (to) me.... I just don’t like you, nor your son [Milton].... And I’m going to do something to hurt you.... I’m going to make you cry every day of your life, ... I’m going to get away with it.... I’m going to ride up and down this alley after I do it.... I’m going to do what I do.... I’m going to turn music up loud, and blow the horn when I get to your door, until you come to the door and start crying.... You going to know I did it, and I know that I did it, and I’m going to get away with it — ...—on everything.”
(R. 407-08)(errors in original.) Jackson then drove away.
At about 8:30 p.m. on the night of February 1, 2006, Pamela, her daughter Shan-iece Montgomery (“Shaniece”), her son Denaris Montgomery (“Denaris”), and Milton left Milton’s mother’s house in Smith-field to return to Pamela’s house where Milton had been staying during the week. Pamela was driving her Chevrolet Cavalier automobile; Shaniece was in the front passenger seat, Denaris was in the backseat on the driver’s side, and Milton was in the backseat on the passenger side. They stopped at the intersection of 19th Street and Avenue V in Ensley. Jackson, whose nickname was “Wolf,” pulled up in a car next to them, yelled, “Bitch,” pointed a rifle out of the window of his car, and began shooting. (R. 505.) Milton said, “Wolf just shot me.” (R. 507.)
After the shooting stopped, Jackson drove off. Pamela also drove the Cavalier away from the intersection but soon passed out. Shaniece climbed over into Pamela’s lap and drove several more blocks before coming to a fire station where she stopped the car.
Sgt. John Ballard of the Birmingham Police Department (“BPD”) received a telephone call about the shooting and responded to the intersection of 19th Street and Avenue V but was subsequently dispatched to the fire station. There, Ballard spoke with Shaniece and Denaris. Denar-is was “kind of frantic, excited” and told Ballard “that Wolf had shot at them.” (R. 268.)
William Ward, a fire lieutenant with the Birmingham Fire and Rescue Service, was returning from a call when he was directed back to the fire station. He “arrived to find a very chaotic scene [with] several citizens in a state of hysteria, [and] several people who were injured.” (R. 369.) Ward determined that Milton was already dead and that Pamela “had several gunshot wounds and was unresponsive.” (R. 370.) Ward and his colleagues placed Pamela in an ambulance and transported her to the hospital, where she died.
Shaniece had been shot four times and Denaris had wounds in his hand, arm, and leg.
Officer Kim McDonald of the BPD’s Crime Scene Unit, arrived at the fire station, where she took photographs and collected evidence. McDonald testified that she later collected bullet fragments and a spent shell casing[4] from the interior of the *917 Cavalier. The Cavalier had been shot at multiple times and had several shattered windows.
McDonald left the fire station and went to the intersection of 19th Street and Avenue V. She took photographs and documented and collected evidence that consisted of shattered glass and a Wolf[5] brand spent shell casing.
Doctor Greg Davis was the medical examiner who performed the autopsies on Pamela and Milton. Davis determined that Milton had a grazing gunshot wound to his forehead. Another bullet passed through Milton’s right arm and entered his chest, where it struck his right lung, his heart, and his left lung before exiting his chest and striking his left arm. A third bullet passed through Milton’s right hip and exited through his right buttock. Davis determined that Milton Poole died “as a result of the injury to his lungs and heart due to [the] gunshot wound to his chest.” (R. 436.)
Davis found that Pamela had been shot four times. One bullet entered Pamela’s chest and struck her diaphragm and liver. Two other bullets, which caused muscle damage, “ended up in [Pamela’s] back.” (R. 441.) A final bullet struck Pamela’s right lung and stopped under her collarbone. Either the bullet that struck her diaphragm and liver or the bullet that struck her lung could have caused Pamela’s death within minutes.
Mitch Rector is a firearms examiner and the forensic-services manager for the BPD. He determined that the Wolf shell casing that was recovered from the intersection of 19th Street and Avenue V was “a 7.62 x 39 millimeter caliber.”[6] (R. 467-58.) Rector examined bullets, bullet fragments, and bullet-jacket fragments that were recovered from the Cavalier and the victims. Of the pieces large enough to provide him useful information, Rector “determined that they could have been fired from the same barrel” but was unable to say conclusively that they had been. Rector established that some firearms that can fire 7.62 x 39 millimeter ammunition include AK 47s, Mac 90s, and SKSs.
I.
Jackson first argues that the jury venire did not represent a fair cross-section of Jefferson County and that there was “a substantial underrepresentation of African Americans on the venire by more than one-third.” (Jackson’s brief, p. 55.)
“In Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), the Supreme Court of the United States explained:
“ ‘In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a “distinctive” group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.’
“The Duren Court defined systematic exclusion as exclusion that is ‘inherent in the particular jury-selection process utilized.’ Id. at 366; see also Gibson v. *918 Zant, 705 F.2d 1543, 1549 (11th Cir.1983) (‘[T]he Duren Court ... defined “systematic” as “inherent in the particular jury-selection process utilized.” ’). ‘[T]he fair cross-section requirement ensures only a venire of randomness, one free of systematic exclusion. It does not ensure any particular venire.’ Gavin v. State, 891 So.2d 907, 945 (Ala.Crim.App.2003)(internal citations and quotations omitted). ‘Rather than being entitled to a cross-sectional venire, a defendant has a right only to a fair chance, based on a random draw, of having a jury drawn from a representative panel.’ Id. (internal citations and quotations omitted). This Court has repeatedly held that the random drawing of veniremembers from a list of licensed drivers satisfies the fair-cross-section requirement. See id. at 946-47; Carroll v. State, 852 So.2d 801, 807-08 (Ala.Crim.App.1999); Clemons v. State, 720 So.2d 961, 972 (Ala.Crim.App.1996); Sistrunk v. State, 630 So.2d 147, 149-50 (Ala.Crim.App.1993).”
Gholston v. State, 57 So.3d 178, 180-81 (Ala.Crim.App.2010).
In the instant case, before the jury was struck, the following occurred:
“[DEFENSE COUNSEL]: Judge,.I want to preface what I want to say by saying that a capital case — my client, once before, in ’06 — sorry, in ’07, was tried, in this situation, by two other defense attorneys, and was convicted and sentenced to death. The Supreme Court sent this case back. I move that we strike this entire venire, and my grounds are that it does not show a proper demographic, as far as black to white jurors in this county. The first thirty-eight jurors is what we are striking from. There are ten black jurors. That’s a little over one-third. I think in this county we have somewhere between forty and fifty percent, probably closer to fifty percent, black citizens. My client is black. Everybody involved in this case, as far as the victims, were black, as well. And I believe my client is prejudiced by, starting out in a capital murder case, in a situation where he has already been convicted and sentenced to the death penalty one time, when he doesn’t have an adequate number of black people on the venire from which to strike. And that’s the gist of the objection. I don’t have to make it any plainer, but there are only ten blacks in the first thirty-eight.
“THE COURT: [Prosecutor]?
“[PROSECUTOR]: Well, Judge, first of all, Mr. Mathis, to think that his client is prejudiced to go in front of this veni-re, having already been convicted once by another jury, at another time, is, to me, kind of silly. This jury obviously is not going to know that he was ever tried before. We all have been in this situation, and perhaps they will figure it out at some point, but it’s not because of anything that we say or do during the course of this. Second of all, Mr. Mathis is correct, in that all four victims in the car, in which the state alleges that Esa[w] Jackson shot into, are, in fact, black. We have a number of other witnesses in this case that are black civilian witnesses, anyway. And I’m not real sure where the prejudice comes in. You know, I understand Mr. Mathis has got to make his objection, but I would submit to the Court that Mr. Jackson is not prejudiced at all by this prosecution.
“THE COURT: Just so I’m clear, the two deceased are African-Americans. Is that right?
“[PROSECUTOR]: That’s correct.
“THE COURT: And the two that make the basis for the attempted mur *919 der, two of the alleged victims, are also African-American. Is that right?
“[PROSECUTOR]: That’s correct, Your Honor.
“THE COURT: Okay, I will deny the motion.”
(R. 98-100.)
Jackson failed to meet his burden of establishing the three Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), factors. The first factor was met because “[t]he State does not dispute that African-Americans are a ‘distinctive group.’ ” (State’s brief, p. 29.) Regarding the second Duren factor, Jackson merely presented the circuit court with the percentage disparity between the population of blacks in Jefferson County and the number of blacks on the jury venire. In establishing that factor, however, “[t]he mere recitation of the percentage disparity between the population of blacks in [Jefferson] County and the number of blacks on the jury venire is not sufficient to allow us to conclude that blacks were not fairly represented on this jury venire.” Stewart v. State, 730 So.2d 1203, 1238 (Ala.Crim.App.1996); see also Pierce v. State, 576 So.2d 236 (Ala.Crim.App.1990).
Jackson also failed to establish the third Duren factor, having produced no evidence indicating that the alleged discrimination was the result of systematic exclusion. He asks us, though, to “remand this case for a hearing on whether this disparity was the result of unconstitutional systematic exclusion.” (Jackson’s brief, p. 58.) When the circuit court gave him the opportunity to be heard at the time he made his motion, however, Jackson’s argument was that he did not “have to make it any plainer, but there are only ten blacks in the first thirty-eight [veniremembers].” (R. 99.) Because Jackson failed to meet his burden under Duren, the circuit court did not err in denying the motion.
II.
Jackson contends that the circuit court prematurely removed a venire-member — T.I.—for cause before the questioning of the veniremember established that the veniremember could not render an impartial verdict.
Under § 12-16-150(7), Ala.Code 1975, a veniremember may be challenged for cause on the ground that “he has a fixed opinion as to the guilt or innocence of the defendant which would bias his verdict.”
“ ‘The trial judge is given much discretion in determining whether a potential juror should be struck for cause. According to Rule 18.4(e), Ala. R.Crim. P.:
“ ‘ “When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.”
[[Image here]]
“ ‘Furthermore, in order to determine whether the trial judge’s exercise of discretion was proper, this Court will look to the questions directed to and answers given by the prospective juror on voir dire. Ex parte Cochran, 500 So.2d 1179 (Ala.1985).’
“Holliday v. State, 751 So.2d 533, 535 (Ala.Crim.App.1999). Also, ‘ “[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demeanor.” ’ McNair v. State, 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994) (quoting Ex parte Dinkins, 567 So.2d 1313, 1314 (Ala.1990)). Finally,
“ ‘[t]he test for determining whether a strike rises to the level of a *920 challenge for cause is “whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.” Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). “Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.” Ex parte Nettles, 485 So.2d 151, 153 (Ala.1983). “The decision of the trial court ‘on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.’ ” Nettles, 435 So.2d at 153.’
“Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).”
Sneed v. State, 1 So.3d 104, 136 (Ala.Crim.App.2007).
The following occurred during individual voir dire in the instant case:
“THE COURT: All right, we are outside the presence of the rest of the venire. We are here with [T.I.]. [T.I.], you had expressed, I think, some concern about sitting on this case—
“[T.I.]: Yes, sir.
“THE COURT: — and perhaps not being able to be fair, maybe to one side or the other. Can you tell us what that is?
“[T.I.]: You hit it dead on the head.
“THE COURT: Okay.
“[T.I.]: Just like you asked yesterday, anybody have a problem with the lag time [i.e., the time between the killings and the second trial],
“THE COURT: Okay.
“[T.I.]: And I think I was the first one to raise my hand. You know, and maybe it’s because I’m old, and it’s old school, but, you know, I used to get a whipping when I did something wrong, and I understand that the system may take a long time, like you said, but I still go with my beliefs and my morals, and, you know, in my heart and in my mind, after what you told us yesterday, and then what I have heard this morning, I’m just — I will be honest with you. I prayed about it last night. I couldn’t find this man innocent or guilty. I just couldn’t do it. Because I don’t agree with how long it took to get to this point. I mean, I know I’m not smart in the law, but I still I just — I can’t see — by the way, I in my mind, it’s too much time, because I’m sitting here listening to what I’m listening to, and I’m shooting holes in everything. My mind is saying how? How could I do this? How could — how could this group convince me that he is innocent? How could this man convince me that he is guilty? Because I’m thinking about all the time that has went by, and then all the words and information you gave yesterday, I’m thinking there is no way.
“THE COURT: Well, [T.I.], let me ask it a little bit differently. And, first, let me say this. The burden of proof is on the State of Alabama, okay? They have the burden of proof in the case. The defense doesn’t have any burden of proof. They don’t have to prove anything, okay? And the other thing is, are you saying that — there will be witnesses presented. I expect exhibits introduced. Are you saying you couldn’t consider what the evidence is, listen to the witnesses, determine the credibility, and then be fair to both sides and rendering a verdict, either way? Are you saying you simply couldn’t render a verdict, either way, even after listening to all the evidence in the case?
“[T.I.]: It’s my belief — and whether I’m right or wrong — and I know you understand that.
[[Image here]]
*921 “[T.I.]: Exactly what you just said. No. And that’s what I struggled with last night, in bed, is I couldn’t make myself find a way, because, you know, I have been on criminal cases before, and I couldn’t make myself find a way to go either way.
[[Image here]]
“THE COURT: Are you saying you simply could not engage even in the jury deliberations?
“[T.I.]: I mean, I could talk with the other jurors, you know, give them my opinion, but as far as it goes right now, I can’t see my opinion changing, just based on my — what I believe.
[[Image here]]
“[PROSECUTOR]: [T.I.], if you listened — if you sat on this jury and you listened to the testimony in this case, and had you had a chance to look at the physical evidence — the photographs and things like that, and based on the testimony and the evidence you were convinced beyond a reasonable doubt of Esa[w] Jackson’s guilt, would you be able to put aside the time factor involved in this case and be able to vote guilty? That’s the question.
“[T.I.]: No, sir, I don’t think I could be convinced.
[[Image here]]
“[PROSECUTOR]: And it’s the time factor that has you stumped.
“[T.I.]: That’s the biggest part of it, yes.
“[PROSECUTOR]: Okay. All right. And you don’t think you would be able to get over that?
“[T.I.]: Not if I want to be honest with myself.
“[PROSECUTOR]: Okay. All right.
“[T.I.]: That’s what I’m trying to do, be brutally honest, because I work — I will work all week in anything in court, but this particular thing hit me right in thé face. I can’t get past it.
[[Image here]]
“[DEFENSE COUNSEL]: If the evidence is the same now as it was in 2006, whether it shows that he did it or whether it shows that he didn’t, does that still mean that the time factor, the time lag is a factor, if the evidence is the same, one way or the other? Where does that put us?
“[T.I.]: That would be my—
“[DEFENSE COUNSEL]: Why is that a problem?
“[T.I.]: That would be my question, is why did it take five or six years, if the evidence is the same? And I’m not being smart. I’m being honest.
“[DEFENSE COUNSEL]: As a matter of fact, I was about to say there are more things on earth than we are meant to know. I don’t know. I don’t have an answer for you. My question was — it’s still the same. If the evidence was the same then as it is now, could you make a determination based on the evidence before you? Because that’s all you are going off, is the evidence before you, the evidence before you, to make a determination on. And they have got the burden of proof to prove beyond a reasonable doubt his guilt. We don’t have any burden whatsoever. It’s on them. My question is, can you make a determination based on the evidence that is presented to you?
“[T.I.]: When was this evidence gotten?
“THE COURT: Well, we can’t get into — we really can’t get into that. I guess we won’t belabor the point. We’ll ask you—
“[T.I.]: I don’t mean to be difficult.
“THE COURT: ... There are a lot will [sic] of circumstances to consider *922 concerning credibility, concerning the evidence. You know, someone may have bias, someone may look nervous on the stand, someone may not remember this fact but remember this fact, someone may have said something different than what they stated before.' Those are all things a jury can consider and should consider. Are you saying you couldn’t consider any of the other factors— whether somebody looks nervous, whether they have told a different story, and the only thing you could focus in on is the time between when this allegedly occurred and the point that we are here at now?
“[T.I.]: Yes, sir.
“THE COURT: Okay. All right, thank you, [T.I.]. We appreciate it.
“[T.I.]: Sorry, guys.
“[PROSECUTOR]: Thank you for being honest.
“THE COURT: And if you would, don’t share this with the other venire. Thank you, [T.I.].”
(R. 198-204.)
After the State made a motion to strike T.I., Jackson’s counsel replied:
“I oppose it. It would be easy for anybody in the world to come in here with some kind of story like that, just to get kicked off the jury. That is foolish, and I don’t think we ought to have to— as reasonable human beings, condone it as an actual excuse for him not to be able to sit; to disregard evidence. And that’s exactly what he said he would do, just because of the lag time. Now, we could have come out and told him that this is the second time it’s tried, but that is improper. And it’s just as improper, I believe, for us to let him go for cause.”
(R. 204-05.)
The circuit court noted that it thought that T.I. was sincere, and it removed T.I. for cause.
T.I. told that trial court that he could not see himself changing his opinion and, when questioned by the prosecutor, stated that he did not think he could be convinced to east a guilty vote. This demonstrated that he could not set aside his opinion and serve as an impartial juror. The circuit court did not abuse its discretion in removing T.I. for cause.
III.
Jackson next argues that the “prosecutor improperly used his voir dire examination as an opportunity to give the jury a preview of his opening statement.” (Jackson’s brief, p. 62.) He also contends that the circuit court erred in overruling the objection he raised and in failing to give a curative instruction.
“Rule 18.4(d), Ala.R.Crim.P., provides: ‘Voir dire examination of prospective jurors shall be limited to inquiries directed to basis for challenge for cause or for obtaining information enabling the parties to knowledgeably exercise their strikes.’
“ ‘ “In selecting a jury for a particular case, ‘the nature, variety, and extent of the questions that should be asked prospective jurors’ must be left largely within the sound discretion of the trial court. Peoples v. State, 875 So.2d 561 (Ala.Crim.App.1979). In other words, the scope of the voir dire examination of the jury venire is within the broad discretion of the trial court. Bowens v. State, 54 Ala.App. 491, 309 So.2d 844 (1974), cert. denied, 293 Ala. 746, 309 So.2d 850 (1975); Witherspoon v. State, 356 So.2d 743 (Ala.Crim.App.1978); Ervin v. State, 399 So.2d 894 (Ala.Crim.App.), cert. denied, 399 So.2d 899 (Ala.1981).” ’
“Hall v. State, 820 So.2d 113, 124 (Ala.Crim.App.1999), quoting Bracewell v. *923 State, 447 So.2d 815, 821 (Ala.Crim.App.1983). ‘It is well settled that the process of voir dire examination remains within the sound discretion of the trial court.’ State v. Watts, 35 So.3d 1, 5 (Ala.Crim.App.2009).”
Gobble v. State, 104 So.3d 920, 947 (Ala.Crim.App.2010).
The record demonstrates that, during the prosecutor’s voir dire examination, the following occurred:
“Now, how many of y’all have seen CSI, and Law and Order, and L.A. Law,[7] and all that kind of stuff? How many of y’all? Okay, almost everybody. Okay. They are very fond — Hollywood is very fond of using such terms as ‘beyond all doubt’ and ‘beyond a shadow, of a doubt.’ Well, that may be that’s the standard in Hollywood, but it’s not the standard here in Alabama. As far as I know, it’s not the standard anywhere in the United States. The standard that I have to prove to each and every member of the jury is ‘beyond a reasonable doubt,’ not to a mathematical certainty, because we are dealing with human beings. Is there anyone here who feels like you won’t be able to measure the evidence in this case beyond a reasonable doubt? Anybody? Is anybody here has learned so much from television, so much from CSI, and so much from Without a Trace, and all those shows, that you won’t be able to ignore whatever you have learned there and listen to what is going on in here? Anybody? Okay. Because CSI is one of those TV shows, and now they have gotten to be all very scientific with those TV shows, where they have exactly forty minutes — or forty-five minutes — to commit a crime, work the scene, grab everything, and get it back to the lab, run it all through the same computer, and get an answer, and then all go have lunch in their Hummer, okay? Now, does anybody believe everything you see in those TV shows? Anybody? And there are a lot of people who do. My mama called me not long ago, and said, ‘Mike, the other night on Judging Amy, they did so-and-so. Why would they do that?’ I don’t know. I don’t know. Some of those TV shows are as good as plugging in Cinderella, because not every case involves all of that kind of scientific evidence. This is one of those. This is one of those cases. It doesn’t involve a lot of science. It has some in it. But you are not going to see DNA in this case, so don’t be looking for it. You are not going to even see the murder weapon in this case.. The bad guy took it with him, took it with him. So don’t be looking for it. You are going to have some scientific testimony when it comes to the shell casings that were found out on the scene, the bullets that were recovered, and you are going to have some eye witness testimony as to what happened, and you are going to have one witness. Denarius [sic] Montgomery, come in and tell you that Esa[w] Jackson pulled the trigger that put all the bullets in that car that killed Pam[ela] and Milton Poole, III and injured him and Shaniece. And Denarius [sic] Montgomery is going to come in here and tell you Esa[w] did it.
“[DEFENSE COUNSEL]: We are getting away from voir dire, and getting into the facts of the case, and I object to it. I think it’s kind of off-base a little bit.
“THE COURT: Overruled. Go ahead.
*924 “[PROSECUTOR]: My point in telling you that is I want to know right now, right now, who is going to look at me and say ‘Mike, if you don’t have the murder weapon, I’m not going to convict him, I don’t care what else comes from that stand. If you don’t have a murder weapon, I’m not going to convict him,’ I wouldn’t know. Who here is going to look at me and say ‘Mike, if you don’t have DNA they pulled off the bullets, to show that it was Esa[w] Jackson that loaded the gun, I don’t want nothing to do with this case, and I am not going to convict’? Because I’m telling you right now, you are not going to see that, no matter how long you sit in this courtroom. Who here is going to look at the fact that I don’t have a murder weapon to present to the jury, and I don’t have DNA to present to a jury, and say ‘What are we doing here, Mike?’ Let’s get it out and — just right now, you have made up in your mind finding him not guilty. Without that, forget it. Who? Who? Okay, I take, by your silence, that each one of you will listen to Denarius [sic] Montgomery, listen to his opportunity to observe who was doing the shooting.”
(R. 107-10.)
A.
Jackson asserts that the “prosecutor improperly used his voir dire examination as an opportunity to give the jury a preview of his opening statement.” (Jackson’s brief, p. 62.)
“ ‘Review on appeal is restricted to questions and issues properly and timely raised at trial.’ Newsome v. State, 570 So.2d 703, 717 (Ala.Crim.App.1989). ‘An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented.’ Pate v. State, 601 So.2d 210, 213 (Ala.Crim.App.1992). ‘[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.’ McKinney v. State, 654 So.2d 95, 99 (Ala.Crim.App.1995) (citation omitted). ‘The. statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.’ Ex parte Frith, 526 So.2d 880, 882 (Ala.1987). ‘The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury.’ Ex parte Works, 640 So.2d 1056, 1058 (Ala.1994).”
Ex parte Coulliette, 857 So.2d 793, 794-95 (Ala.2003).
At trial, Jackson did not object to the prosecutor’s comments on the ground that voir dire was being used to preview his opening statement, only that the prosecutor was “getting away from voir dire, and getting into the facts of the case.” (R. 109.) This issue is, therefore, not properly before us, and Jackson is due no relief.
B.
Jackson also contends that the circuit court erred in overruling the objection he raised and in failing to give a curative instruction during the voir dire of the veni-re.
The circuit court did not abuse its discretion when it overruled Jackson’s objection. The State argues that
“[i]t is clear from the portion of the transcript quoted above that the prosecutor was concerned that some of the potential jurors would be unwilling to convict unless the State presented scientific or forensic evidence of the type often seen on television. In other *925 words, the prosecutor was concerned about the so-called ‘CSI effect.’ ”
(State’s brief, p. 41.) We agree.
In Deaton v. State, 999 N.E.2d 452 (Ind.Ct.App.2013), the Court of Appeals of Indiana recently held that a defendant had “not demonstrated fundamental error in the State’s comments during voir dire regarding the ‘CSI effect’ ” when the State engaged in the following exchange with a veniremember:
“[State]: Does anyone watch CSI? I watch it. It’s a good show.,
“[Potential Juror], right?
“[Potential Juror]: Um-hum.
“[State]: Do you agree that it’s not reality?
“[Potential Juror]: It’s so not reality.
“[State]: The police don’t solve crimes in an hour. Would you need DNA evidence in a case like this to be able to consider-
“[Potential Juror]: Hard and fast DNA? No.
“[State]: Does anyone-would anyone need DNA evidence in a case like this?
“Would anyone need fingerprint evidence in a case like this? Is anyone going to hold me to a CSI standard? Make me bring in all sorts of forensic evidence and fingerprints and DNA and do the light shows that they do on that show? Is anyone expecting that?”
Deaton, 999 N.E.2d at 455.
In the instant case, the prosecutor was entitled to obtain information from the members of the venire that would have assisted him in exercising his strikes. Certainly, the State was entitled to know whether any member of the venire would negatively view a case in which there would be little scientific evidence or a murder weapon.
Further, because Jackson did not request a curative instruction there is nothing for this Court to review, and he is due no relief on that ground. See, e.g., Melson v. State, 775 So.2d 857 (Ala.Crim.App.1999).
IV.
Jackson asserts that the circuit court committed error when it allowed Melanie Torrence to testify about a conversation she overheard between Jackson and Jackson’s cousin, whom she knew as “Pig.” (R. 862.) In this conversation, which took place a couple of weeks before the murders and attempted murders, Pig informed Jackson that he had purchased a rifle. Jackson makes three separate arguments regarding the admission of this testimony: (1) that its probative value was outweighed by its prejudicial effect; (2) that it constituted improper character evidence; and (3) that it confused and misled the jury.
Before the testimony, Jackson objected to its admission on the basis that “the prejudice far outweighs the probative value.” (R. 328.) The prosecutor informed the circuit court that another witness would testify that the shell casing found at the intersection where the shooting occurred could have been fired from the type of rifle mentioned in the conversation and that Jackson “apparently [had] one available to him.”[8] (R. 331.) The circuit court overruled the objection. Torrence testified that while she was riding with Jackson in his car, Jackson communicated with Pig over a two-way radio. In that conversation, “Pig said he had bought a gun or something.” (R. 362.) The gun purchased by Pig was “an SK” or “[o]ne of them [sic] guns.” (R. 363.)
*926 “ ‘The admission or exclusion of evidence is a matter within the sound discretion of the trial court.’ Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001). ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with regard to the admission of collateral-bad-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). See also Irvin v. State, 940 So.2d 331, 344-46 (Ala.Crim.App.2005).”
Windsor v. State, 110 So.3d 876, 880 (Ala.Crim.App.2012).
A.
Jackson first contends that the prejudicial nature of the testimony outweighed its probative value. Rule 401, Ala. R. Evid., provides that “‘[rjelevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Under Rule 403, Ala. R. Evid., “[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.... ”
We have explained that
“ ‘Evidence to show that accused owned, possessed, or had access to, tools, implements, weapons, or any articles with which the particular crime was or might have been committed is relevant, at least where accused is identified as having been at or near the scene of the crime at about the time of its commission, as is also evidence that he owned or had in his possession weapons with which the crime was or might have been committed prior to, or after, the commission of the crime. On the other hand, evidence of possession by accused of weapons, or various poisons, not in any way connected with the crime charged is inadmissible.’ 22A C.J.S. Criminal Law.”
Humphrey v. State, 370 So.2d 344, 347 (Ala.Crim.App.1979).
The evidence adduced at trial established that an SKS rifle could have fired the ammunition used in the murders and attempted murders. Pig informed Jackson that he had purchased “an SK” rifle. (R. 363.) This evidence demonstrated that Jackson had access to the type of gun that might have been used to commit the crime. The trial court did not abuse its discretion in admitting the testimony.
B.
Jackson next argues that the admission of the testimony constituted improper character evidence. Before the circuit court, however, Jackson objected 'to the admission of the testimony only on the basis that its probative value was outweighed by its prejudice.
In not objecting to the testimony on the basis that it constituted improper character evidence, Jackson waived those grounds and is due no relief on this claim. See Ex parte Coulliette, supra.
C.
Finally, Jackson asserts that Tor-rence’s testimony confused and misled the jury. As with his second argument about this testimony, however, Jackson also waived this argument by not raising it before the circuit court. See Ex parte Coulliette, supra.
*927 V.
Jackson contends that during the guilt phase of his trial, “extremely emotional victim impact testimony was presented that was entirely irrelevant to the issue of whether or not Mr. Jackson was guilty of capital murder.” (Jackson’s brief, p. 36.) This argument is based on the direct examination testimony of Loretta, Milton’s mother.
In Ex parte Jackson, 68 So.3d 211 (Ala. 2010), the Alabama Supreme Court reversed Jackson’s earlier convictions under a plain-error review because, during Loretta’s testimony in Jackson’s first trial, the following occurred:
“ ‘Q. [PROSECUTOR:] Okay.
“ ‘A. [LORETTA:] But I thought he was talking about doing something to “me.” I asked still, “What you going to do?” He said, “Never f-mind what I’m going to- do.” He said, “Because what I’m going to do,” he said, “you know, you ain’t going to be able to take it.”
“ ‘Q. Okay.
“ ‘A. And he don’t lie. He didn’t lie. I ain’t able to take it. (witness crying)
‘“Q. Okay.
“ ‘A. He killed my child.
“ ‘Q. Okay. Hang on. Hang on. Hang on. Just take a minute. Take a minute. Take a minute.
“ ‘A. Oh, God help me.
“ ‘Q. Take an easy breath.
“ ‘A. Help me, Jesus. Help me, God.
“ ‘Q. Breathe.
“ ‘A. Help me, Lord Jesus, Jehovah; please help me.
“ ‘Q. Ma’am-okay?
“ ‘A. Thank you, Jesus.
“ ‘Q. Let me ask you a question. You okay? You okay?
“ ‘A. I never be okay anymore.
“ ‘Q. All right. Well, let me ask you one more question, and I will be done. Okay?
“‘A. Okay.
“‘Q. Okay?
“ ‘A. Go ahead.
“ ‘Q. All right. About how long before [Milton] was killed did that conversation take place?
“ ‘A. Within a week or two, no longer; wasn’t quite two weeks.
“‘Q. Okay.
“ ‘A. It was early one morning. I won’t forget it.
‘“Q. Okay.
“ ‘A. He was riding along the side, and he started coming by the house and stuff, flashing a whole lot of l’s in the windows, and you know, we be out in the yard, and he just come back peeking (sic), doing the peeking things (sic), you know.
“‘Q. Okay.
“ ‘A. Peeking things. And I paid no attention. I thought he was talking about doing something to me. But then when he said I wasn’t going to be able to take it, I didn’t have no idea he was talking about killing my child, until the night he did it, when my child told me—
“‘[DEFENSE COUNSEL]: We are going to object to this, non-responsive; not been a question asked in fifteen minutes.
“ ‘[PROSECUTOR]: Hold on.
“ ‘THE WITNESS: Because it wasn’t your child killed. It wasn’t your child killed, (witness crying)
“‘THE COURT: Hang on, ma’am. Listen to the question..
“‘THE WITNESS: Oh, it hurts so bad.
*928 “‘THE COURT: I know it does. Just hang on just for a second. Just close your eyes and think about Jesus for a second. Just hang on just a second.’
“(Emphasis added; parenthetical language original.)”
Ex parte Jackson, 68 So.3d at 214-15.
“It is incumbent upon counsel to obtain an adverse ruling to preserve an issue for appellate review.” Pettibone v. State, 91 So.3d 94, 114 (Ala.Crim.App.2011).
In the instant case, before Loretta testified, the circuit court admonished her not to give her opinion about who shot Milton or how the loss of her son made her feel. During Loretta’s testimony on direct examination, the following exchange occurred:
“Q. [PROSECUTOR:] And what else did Esa[w] Jackson say at that time?
“A. [LORETTA:] He say, “You ain’t did nothing (to) me.’ He say T just don’t like you, nor your son.’ He said ‘And I’m going to do something to hurt you.’ He said ‘I’m going to make you cry every day of your life,’ and he said ‘I’m going to get away with it.’ He said—
“Q. Okay.
“A. —‘I’m going to ride up and down this alley after I do it.’ He said ‘I’m going to do what I do.’ And he said ‘I’m going to turn music up loud, and blow the horn when I get to your door, until you come to the door and start crying.’ He said ‘You going to know I did it, and I know that I did it, and I’m going to get away with it — ’
“Q. Okay, calm down.
“A. He said ‘ — on everything.’
“Q. All right, hold on. Hold on, now. Hold on. Hold on.
“A. Okay.
“Q. Hold on.
“A. Father, God, help me, Jesus. Help me, Jesus.
“Q. Okay. Here we go.
“THE COURT: Do you want to take a couple of minutes, before we proceed on?
“[PROSECUTOR]: If we could.
“THE COURT: Sure. Let’s take a break.
“THE WITNESS: I’m sorry.”
(R. 407-08.)
After the circuit court excused the jury from the courtroom, the following exchange took place:
“[DEFENSE COUNSEL]: I want to point out for the record she had a breakdown in front of the jury and got very dramatic, just like she did in the last trial. I object to it. I believe it’s contrived and I don’t believe that it’s sincere at all.
“THE WITNESS: But this jury may not — have you ever lost a child?
“THE COURT: No, no, no, we are not having a conversation here. He just made an objection. He has a right to. We’ll deal with it when we come back from recess, okay?”
(R. 408-09.)
Following the recess, the direct examination of Loretta continued without the circuit court ruling on Jackson’s objection. Jackson now argues that “Ms. Poole’s outburst was classic victim impact evidence.” (Jackson’s brief, p. 38.)
Because Jackson did not obtain an adverse ruling on his objection, however, there is nothing for this Court to review. Further, Jackson did not argue in his objection before the trial court that Poole’s comments constituted victim-impact evidence. This argument is not, therefore, *929 properly before us. See Ex parte Coul-liette, supra.
Moreover, even if Jackson had received an adverse ruling from the circuit court that Loretta’s testimony constituted improper victim-impact evidence, he would not be entitled to relief on this issue. The Alabama Supreme Court reversed Jackson’s original convictions under a plain-error standard because Loretta’s “expression of anguish and the inseparable inadmissible opinion and victim-impact testimony [was] communicated to the jury [and rose] to the level of plain error.” Ex parte Jackson, 68 So.3d at 218. The Court noted that Loretta had “expressed] her opinion as to Jackson’s guilt” and that statements such as “I ain’t [sic] able to take it,” “I never [sic] be okay anymore,” and “it hurts so bad” were victim-impact statements. Id. at 217. In the instant case, Loretta did not express her opinion as to Jackson’s guilt. Nor did she make statements similar in nature to the ones that the Supreme Court determined were victim-impact statements.
VI.
Jackson contends that the circuit court committed error when it allowed Sergeant John Ballard to relate a statement Denaris made to Ballard at the fire station. In the statement, Denaris identified Jackson as the shooter.
“ ‘The admission or exclusion of evidence is a matter within the sound discretion of the trial court.’ Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001). ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).”
Windsor v. State, 110 So.3d 876, 880 (Ala.Crim.App.2012).
Hearsay is “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” Rule 801(c)(1), Ala. R. Evid. Rule 802, Ala. R. Evid., provides that “[h]earsay is not admissible except as provided by these rules, or by other rules adopted by the Supreme Court of Alabama or by statute.” The Advisory Committee’s Notes to that rule explain that the “broad exclusion [the inadmissibility of hearsay] ... is subject to exceptions found in other Alabama Rules of Evidence....” One exception to the exclusion of hearsay is found in Rule 803(2), Ala. R. Evid., referred to as the “excited utterance exception,” allows for the admission of “[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.”
Professors Gamble and Goodwin have explained that Rule 803(2), Ala. R. Evid., “sets out three conditions which must be met for admission of the statement. There must be a startling event or condition, the statement must relate to the circumstances of the occurrence and the statement must be made before time has elapsed sufficient for the declarant to fabricate.” Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 265.01(l)(6th ed.2009).
“The Alabama Supreme Court in Ex parte C.L.Y., 928 So.2d 1069 (Ala.2005), stated the following concerning this exception to the hearsay rule:
“ ‘ “[S]trict contemporaneity should not be. required between the statement and the occurrence in order for the declaration to qualify for the present hearsay exception. Indeed, *930 our courts have said that time alone is not a determining criterion and that applicability of this exception cannot be decided upon the basis of any specified time or number of minutes between the act and the declaration. The critical factor is whether the person who made the statement is still under the influence of the emotions arising from the startling event. Stated differently, the statement does not have to be made contemporaneously with the startling event or condition but it must be uttered contemporaneously with the excitement resulting from the startling event or condition. How long the excitement prevails is largely determined by the character of the event or condition.” ’
“928 So.2d at 1072-73, quoting Charles W. Gamble, McElroy’s Alabama Evidence § 265.01(2) (5th ed.1996) (footnotes omitted). ‘In deciding whether the declarant remained under the stress of excitement, the trial court may consider the context of the statement itself.’ McElroy’s Alabama Evidence § 265.01(2). ‘The question of whether the statement is spontaneous in a given case is to be decided upon the facts and circumstances of that case, and such determination is a question for the trial court.’ O’Cain v. State, 586 So.2d 34, 38 (Ala.Crim.App.1991).”
Scott v. State, 163 So.3d 389, 427 (Ala.Crim.App.2012) (footnote omitted).
The record demonstrates that the following occurred during the direct examination of Ballard:
“Q. [PROSECUTOR:] Okay. Did you have a conversation with, or did you come to know a fellow by the name of Denaris Montgomery, out there on the scene?
“A. [BALLARD:] I did.
“Q. All right. And did' you have a conversation with Denaris Montgomery?
“A. I did.
“Q. All right, and what was his physical condition at the time you had this conversation with Denaris Montgomery?
“A. He had — from what I believe, he had glass shards in his arm.
“Q. Okay, was he bleeding at all?
“A. Yes.
“Q. All right. Did that indicate to you that he was inside the car—
“[DEFENSE COUNSEL]: I’m going to object to anything he indicated or said, or anything else that’s hearsay.”
(R. 259.)
The trial court sustained the objection and excused the jury before hearing arguments outside its presence regarding why any statement Denaris made to Ballard should be admitted. The State argued that the statement it wished to admit would constitute an excited utterance; Jackson argued that because the “incident was over ... [t]here was nothing to be excited about.” (R. 262.) The circuit court overruled Jackson’s objection and, when Ballard’s direct examination resumed, the following occurred:
“Q. [PROSECUTOR:] Sergeant Ballard, I think we were to the point that you had a conversation with Denaris Montgomery in this case, correct?
“A. [BALLARD:] Correct.
“Q. And where did that conversation take place?
“A. In front of the fire station sixteen.
“Q. About how much time had passed between the time that you got the call to go to the fire station sixteen and the time that you had this conversation with Denaris Montgomery?
“A. Less than five minutes.
*931 “Q. And at that time, tell us, if you will, what Mr. Montgomery’s physical condition was.
“A. He seemed kind of frantic, excited.
“Q. Okay.
“A. Physical condition, he was—
“Q. Physical condition.
“A. Pm sorry, excuse me.
“Q. That’s all right.
“A. He had — he was bleeding, had cuts to his arms, apparently from glass.
“Q. Okay. And what, if anything, did he say to you about what had happened?
“A. He stated that Wolf[9] had shot at them.
“Q. Okay, did he tell you where that took place?
“A. No. Well, excuse me, he said it took place over at Avenue V and 19th Street.”
(R. 267-68.)
The evidence adduced at trial satisfied the three conditions which must be met before a statement can be admitted under a theory of excited utterance. First, De-naris had just experienced being shot along with his mother, sister, and friend and was still “frantic [and] excited” and was bleeding from cuts on his arms. (R. 268.) Second, the statement regarding who had fired the shots directly related to the shooting. Finally, Ballard testified that “[l]ess than five minutes” had passed from the time he was told to go to the fire station and his conversation with Denaris. (R. 268.)
We are not persuaded by Jackson’s argument that “it is clear that there was sufficient time for Denaris Montgomery to reflect upon what had happened and to give a deliberate response.” (Jackson’s brief, p. 44.) Testimony established that Denaris’s statement was contemporaneous with the excitement resulting from the shooting; therefore, the third condition was satisfied. The trial court did not abuse its discretion in admitting the statement as an excited utterance.
Moreover, the statement was cumulative to Denaris’s trial testimony. “This Court has repeatedly held that ‘[a]ny error in the admission of hearsay testimony [is] harmless beyond a reasonable doubt when the testimony is cumulative to other lawfully admitted testimony.’ ” White v. State, [Ms. CR-09-0662, August 30, 2013] — So.3d -, - (Ala.Crim.App.2013) (quoting Belisle v. State, 11 So.3d 256 at 299 (Ala.Crim.App.2007), citing, in turn, McNair v. State, 706 So.2d 828, 851 (Ala.Crim.App.1997)).
During his direct examination, Denaris testified that, at the intersection of 19th Street and Avenue V, Jackson shot a rifle at the car in which Pamela, Shaniece, De-naris, and Milton were traveling. Therefore, assuming, arguendo, that the admission of Denaris’s statement to Ballard was erroneous, it would have been cumulative to Denaris’s testimony and would have been harmless.
VIL
Jackson argues that the “trial court erred by limiting defense counsel’s cross-examination of Loretta Poole and issuing an instruction directing the jury to disregard defense counsel’s question and Ms. Poole’s answers about other suspects who had been charged in the crime.” (Jackson’s brief, p. 28.)
*932 “ ‘ “ ‘Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.... A more particular attack on the witness’ credibility is effected by means of cross-examination directed towards revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand....””
“Ex parte Lynn, 477 So.2d 1385, 1386 (Ala.1985) (quoting other cases). See also Newsome v. State, 570 So.2d 703, 714 (Ala.Crim.App.1989) (‘The trial judge may reasonably limit the range of cross-examination on matters that are repetitious, argumentative, collateral, irrelevant, harassing, annoying, or humiliating. Atwell v. State, 354 So.2d 30 (Ala.Cr.App.1977), cert. denied, 354 So.2d 39 (Ala.1978).’).”
McMillan v. State, 139 So.3d 184, 202 (Ala.Crim.App.2010).
Under the doctrine of invited error, “the appellant cannot allege as error proceedings in the trial court that were invited by [him] or that were a natural consequence of [his] own action.” Inmin v. State, 668 So.2d 152, 155 (Ala.Crim.App.1995), citing Bamberg v. State, 611 So.2d 450, 452 (Ala.Crim.App.1992).
The record in the instant case demonstrates that, on direct examination, Loretta testified that a man named “Monk” and a “bald-headed guy” were in the car with Jackson during the confrontation between her and Jackson. (R. 406.) Defense counsel began the cross-examination of Loretta by asking about a recorded statement she had given officers of the BPD after the murders and attempted murders. Defense counsel specifically asked Loretta whether during that interview she mentioned Monk or the man with the bald head and she replied that no one had asked her about them. Defense counsel then asked Loretta whether she had told the officers that someone named “Julius” had been in the car with Jackson, and she said that “Juice was in the car with him, yes.” (R. 411.) When asked, Loretta testified that Jackson, Monk, and “the bald-headed guy” had been arrested for Milton’s murder. (R. 411.) Defense counsel then asked whether the cases for the other two men had been thrown out, and Loretta replied, “I don’t know.” (R. 411.)
The State objected to the relevance of the line of questioning. Outside the presence of the jury, Jackson informed the circuit court as follows regarding the relevance of the questioning:
“The two men whose cases were thrown out are the two men she just happened to very handedly remember in place in the backseat of his car, when she was talking to him during this conversation, a conversation she had already talked about twice; once in her recorded conversation with [BPD] Detective Cotton, and another time when she testified in this trial. And in neither of those situations did she mention either of these people.”
(R. 412.)
The circuit court informed defense counsel that he had impeached Loretta with the prior statement, and Jackson then argued that Loretta was “trying to bolster the *933 State’s case by saying they were with [Jackson].”[10] (R. 413.) The circuit court noted that the State had not interjected the possibility that the other men had been involved in the murders and attempted murders and that any questioning about their involvement would not be relevant until the State did so. The State asked the circuit court to instruct the jury to disregard defense counsel’s question; Jackson agreed. The circuit court stated that it would instruct the jury to disregard Loretta’s statement about others who had been charged and defense counsel replied, “Mhat’s fíne.” (R. 414.)
The line of questions regarding earlier statements in which Loretta did not mention the two other men was relevant to show that she had made a prior inconsistent statement. The questions regarding the arrests and prosecutions of the men were not, however, relevant to any issue in the case. As the circuit court correctly noted, the State had not indicated during the course of the trial that the other men had been involved in the murders and attempted murders. The circuit court did not abuse its discretion by limiting Jackson’s cross-examination of Loretta to only relevant questions.
Further, although Jackson now complains about the limiting instruction given to the jury, he is precluded from challenging it under the doctrine of invited error. Jackson agreed with the State’s request for a curative instruction and told the circuit court that the instruction as announced was “fíne.” (R. 414.) He is, therefore, due no relief on this claim.
VIII.
Jackson raises several issues regarding the circuit court’s failure to give his 2nd, 19th, 20th, and 21st requested jury instructions.
“ ‘ “ ‘A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts of the case. Raper v. State, 584 So.2d 544 (Ala.Cr.App.1991). We do not review a jury instruction in isolation, but must consider the instruction as a whole, Stewart v. State, 601 So.2d 491 (Ala.Cr.App.1992), aff'd in relevant part, 659 So.2d 122 (Ala.1993), and we must evaluate instructions like a reasonable juror may have interpreted them. Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); Stewart v. State.’ ”
“ ‘Griffin v. State, 790 So.2d 267, 332 (Ala.Crim.App.1999), quoting Ingram v. State, 779 So.2d 1225, 1258 (Ala.Crim.App.1999). “This court has consistently held that a trial court’s oral charge to the jury must be viewed in its entirety and not in ‘bits and pieces.’ Parks v. State, 565 So.2d 1265 (Ala.Cr.App.1990); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988); Lambeth v. State, 380 So.2d 923 (Ala.), on remand, 380 So.2d 925 (Ala.Cr.App.1979), writ denied, 380 So.2d 926 (Ala.1980).” Smith v. State, 585 So.2d 223, 225 (Ala.Crim.App.1991).’
“Smith v. State, 908 So.2d 273 (Ala.Crim.App.2000). The trial court has broad discretion in formulating its jury *934 charges. Williams v. State, 611 So.2d 1119, 1123 (Ala.Crim.App.1992).”
Snyder v. State, 893 So.2d 488, 551 (Ala.Crim.App.2003).
“We have held that: ‘The ground that a jury instruction is a correct statement of the law is insufficient to preserve an objection to the trial court’s refusal to give the instruction.’ Knight v. State, 710 So.2d 511, 513 (Ala.Crim.App.1997). See also Ex parte R.D.W., 773 So.2d 426 (Ala.2000).”
Marshall v. State, 20 So.3d 830, 836 (Ala.Crim.App.2008).
“Any conceivable error in the sufficiency of the trial court’s jury instruction was invited by defense counsel’s acquiescence to the charges given.”
Turner v. State, 924 So.2d 737, 771 (Ala.Crim.App.2002).
Rule 21.3, Ala. R.Crim. P., provides, in relevant part:
“No party may assign as error the court’s giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection.”
A.
Jackson asserts that the “trial court improperly refused to instruct the jury that if any witnesses exhibited anger or ill will toward the defendant and that anger and ill will created a reasonable doubt of his guilt it should acquit him.” (Jackson’s brief, p. 47.) His second proposed jury instruction read:
“If any or all of the witnesses for the state have exhibited or admitted bias, prejudice, anger, or ill will against the defendant, or from all the evidence in the case you find such bias, prejudice, anger or ill will on the part of all or any of the state’s witnesses, and if these things, when considered by you in connection with all the other evidence in the case, create in your minds a reasonable doubt of the defendant’s guilt, you should acquit him.”
(C. 332.)
During the charge conference, the State informed the circuit court that it believed the proposed instruction was “a misstatement of the law.” (R. 568.) The circuit court informed Jackson that it agreed with the State and proposed certain changes to the charge. Defense counsel replied that he “believe[d] it to be a correct statement of law ... and [that his] client would be prejudiced if the Court denie[d] it.” (R. 568-69.) The circuit court then announced that it would give the following modified instruction:
“If any or all of the witnesses for the State or defense have exhibited or admitted bias, prejudice, or from all of the evidence in the case you find such bias/prejudice on the part of any or all of the witnesses, and if these things, when considered by you, in connection with all of the other evidence in the case, creates in your mind a reasonable doubt of the defendant’s guilt, you should acquit him.”
(R. 569.)
The State announced that it felt the modified charge was a more accurate statement of law and, when the circuit court stated that it would give the modified instruction, Jackson replied, “Yes, sir.” (R. 569.) After the jury had been charged but before it retired to deliberate, Jackson did not object on the basis of the modified instruction as given by the circuit court.
Here, Jackson acquiesced in the circuit court’s jury instructions by answering, *935 “Yes, sir” to the charge announced by the circuit court and not objecting to the charge once given to the jury. See Turner, 924 So.2d at 771. Jackson is due no relief.
B.
Jackson next argues that the circuit court erred in refusing to give his 19th jury instruction, which read:
“The Court charges the jury that if a conviction in this case depends upon the testimony of a single witness, and if the jury has a reasonable doubt as to the accuracy of the testimony of such witness, then you cannot convict the defendant.”
(C. 336.)
During the charging conference, the circuit court noted that it would refuse the requested instruction and Jackson had no response. Following the charging of the jury, but before it had retired to deliberate, defense counsel objected to the trial court’s refusal to give the requested instructed on the ground that “[his] client [was] extremely prejudiced by the Court not giving it. It is an accurate statement of law, and I believe he is entitled to it under these circumstances.” (R. 625.) The circuit court denied the objection.
Jackson objected only on the grounds that the instruction was a correct statement of the law and that he would be prejudiced by the circuit court’s failure to give it; he failed, therefore, to preserve his objection for our review. See Marshall, 20 So.3d at 836.
C.
Jackson also contends that the “trial court improperly refused to give a charge proposed by the defense instructing the jury that it could acquit Mr. Jackson if they believed that an eyewitness could be mistaken about identity.” (Jackson’s brief, p. 8.) At trial Jackson submitted two proposed instructions relating to mistaken identity.
Jackson’s 20th proposed jury instruction was:
“You are instructed so far as the identity of the defendant is concerned, that if you believe, from the evidence and the circumstances proved, that there is a reasonable doubt whether the witness might be mistaken as to identity, then you would not be authorized to convict the defendant. The corroborating circumstances, tending to establish his identity must be such as, with other testimony, produces a degree of certainty in your minds so great that you can say that you have no reasonable doubt of the identity of the defendant.”
(C. 337.)
Jackson’s 21st proposed jury instruction was:
“If the jury finds that the witness was honestly mistaken in his identification of the defendant, then a reasonable doubt is created as to the guilt of the defendant and he must be acquitted.”
(R. 337.)
During the charging conference, the circuit court announced that it was refusing to give Jackson’s 20th and 21st proposed instructions as written but that it would give the following charge in their place:
“The law places the burden on the State to identify the defendant. The law doesn’t require the defendant to prove he has been wrongly identified by eye witness testimony. You first should determine whether any of the following factors exist, and, if so, to the extent the accuracy of the identification by an eye witness. Factors you may consider are: The opportunity of the witness to observe. That includes any physical condi *936 tion which could affect the length of time of observation and any limitation on observation, like obstruction or poor lighting. Two, the emotional state of the witness at the time, and including that which might be caused by the use of a weapon or a threat of violence. Three, whether the witnessed [sic] observed the defendant on earlier occasions. Four, whether a significant amount of time elapsed between the crime charged and the later identification, the degree of certainty demonstrated by the witness at the time of any identification of the accused, whether there are any other circumstances that might affect the accuracy by a witness identification.”
(R. 572.)
When asked, Jackson replied: “No, I have no objection to your charge.” (R. 572.) Following the charging of the jury, defense counsel objected to the failure of the circuit court to charge the jury on his 20th proposed jury instruction on the grounds that it was “an accurate statement of the law [and his] client [was] entitled to have the jury hear it, and [he] believe[d] he [was] prejudiced by the Court refusing to give it.” (R. 626.) Jackson did not object to the circuit court’s failure to give his 21st proposed jury instruction.
1.
We first consider Jackson’s claim of error relating to his 20th proposed jury instruction.
In Marshall, the defense attorney objected to the circuit court’s refusal to give a requested instruction on the grounds that it was a correct statement of law and that his client was prejudiced by the trial court’s refusal. See Marshall, 20 So.3d at 836. Because this objection was insufficient to preserve it for our review, we conducted a plain-error analysis and held, in light of other instructions given by the circuit court, that the instruction was not erroneous.
In the instant case, Jackson objected only on the grounds that the instruction was a correct statement of the law and that he would be prejudiced by the circuit court’s failure to give it; he failed, therefore, to preserve his objection for our review.
Moreover, any possible error in the circuit court’s jury instructions relating to Jackson’s 20th proposed jury instruction was invited by Jackson’s acquiescence to the charge announced by the trial court.
2.
We next address Jackson’s claim regarding his 21st proposed jury instruction. Jackson did not object to the trial court’s failure to give his 21st proposed jury instruction after the jury had been charged but before it retired to consider its verdict.
Rule 21.3, Ala.R.Crim.P. provides:
“No party may assign as error the court’s giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.”
Because he did not object to the circuit court’s failure to give his 21st proposed jury instruction, Jackson failed to preserve this claim for our review. See Marlowe v. State, 854 So.2d 1182 (Ala.Crim.App.2002).
Moreover, any possible error in the circuit court’s jury instructions relating to Jackson’s 21st proposed jury instruction was invited by Jackson’s acquiescence to *937 the charge announced by the trial court. See Turner, 924 So.2d at 771.
IX.
Jackson argues that the evidence was insufficient to sustain his conviction. His brief on this issue, however, demonstrates that he is attacking not the sufficiency of the evidence but the weight of the evidence. For example, he asserts that the “State presented’false and unreliable eyewitness testimony along with tenuous circumstantial evidence” and that “[t]here was very little evidence presented at trial that connected Mr. Jackson with the crime.” (Jackson’s brief, p. 50.) In an alternative to his argument, Jackson asks us to hold that his conviction was “against the great weight of the evidence.” (Jackson’s brief, p. 53.)
We have explained:
“ ‘ “The weight of the evidence is clearly a different matter from the sufficiency of the evidence. The sufficiency of the evidence concerns the question of whether, ‘viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.’
“ ‘ “In contrast, ‘the “weight of the evidence” refers to a “determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other.” ’ We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial. ‘“The credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.” ’ ” ’
“Seaton v. State, 645 So.2d 341, 342-43 (Ala.Crim.App.1994), quoting Johnson v. State, 555 So.2d 818, 819-20 (Ala.Crim.App.1989) (citations omitted).
“ ‘Once a prima facie case has been submitted to the jury, this Court will not upset the jury’s verdict except in extreme situations in which it is clear from the record that the evidence against the accused was so lacking as to make the verdict wrong and unjust. Deutcsh v. State, 610 So.2d 1212, 1234-35 (Ala.Cr.App.1992). This Court will not substitute itself for the jury in determining the weight and probative force of the evidence. Benton v. State, 536 So.2d 162, 165 (Ala.Cr.App.1988).’
“May v. State, 710 So.2d 1362, 1372 (Ala.Crim.App.1997).
“ ‘Furthermore, on appeal, there is a presumption in favor of the correctness of the jury verdict. Saffold v. State, 494 So.2d 164 (Ala.Cr.App.1986). Although that presumption of correctness is strong, it may be overcome in a limited category of cases where the verdict is found to be palpably wrong or contrary to the great weight of the evidence. Bell v. State, 461 So.2d 855, 865 (Ala.Cr.App.1984).’
“Henderson v. State, 584 So.2d 841, 851 (Ala.Crim.App.1988).”
Thompson v. State, 97 So.3d 800, 810 (Ala. Crim.App.2011).
Accordingly, we will address this issue as a challenge to the weight of the evidence.
In the instant case, it is not clear that the evidence against Jackson “was so lacking as to make the verdict wrong and just.” Thompson, 97 So.3d at 810. It is undisputed that Pamela, Shaniece, Denar-is, and Milton were shot with a rifle and that Pamela and Milton died from their injuries. Loretta, Milton’s mother, testified that a couple of weeks before the shooting Jackson had told her that he did not like her or Milton and that he was *938 going to do something to hurt her. At around the same time, Pig told Jackson that-he had “an SK” rifle. (R. 363.) An SKS rifle could be used to fire the ammunition used in the shooting. Denaris testified that Jackson was the person firing the gun at him, his mother, sister, and friend. Although Jackson challenges the reliability of certain witnesses, the jury determined their credibility. Jackson is due no relief on this claim.
X.
Jackson next asserts that the circuit court erred in failing to grant him a new trial. Jackson reasons that, because he was eventually determined to be ineligible for the death penalty, the “erroneously death-qualified jury that convicted [him] was wrongly impaneled, and this error violated [his] rights to an impartial jury.” (Jackson’s brief, p. 67.) Although after the probation officer’s report suggested that Jackson may be mentally retarded but before the circuit court conducted an Atkins[11] hearing, Jackson moved the circuit court for a new trial, his motion was based on a different argument than he now presents to this Court.
The record demonstrates that the post-judgment motion made by Jackson’s defense counsel was “that the verdict be set aside and us be able to try this case again, based on this new knowledge we have come in contact with, because I obviously dropped the ball by not attacking this [mental-retardation] issue head-on, to begin with.” (R. 703.) The trial court denied the motion.
“‘Review on appeal is restricted to questions and issues properly and timely raised at trial.’ Newsome v. State, 570 So.2d 703, 717 (Ala.Crim.App.1989). ‘An issue raised for the first time on appeal is not subject to appellate review because it has not been properly preserved and presented.’ Pate v. State, 601 So.2d 210, 213 (Ala.Crim.App.1992). ‘“[T]o preserve an issue for appellate review, it must be presented to the trial court by a timely and specific motion setting out the specific grounds in support thereof.” ’ McKinney v. State, 654 So.2d 95, 99 (Ala.Crim.App.1995) (citation omitted). ‘The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.’ Ex parte Frith, 526 So.2d 880, 882 (Ala.1987). ‘The purpose of requiring a specific objection to preserve an issue for appellate review is to put the trial judge on notice of the alleged error, giving an opportunity to correct it before the case is submitted to the jury.’ Ex parte Works, 640 So.2d 1056, 1058 (Ala.1994).”
Ex parte Coulliette, 857 So.2d 793, 794-95 (Ala.2003).
This Court will not consider the argument that the death-qualified jury was wrongly impaneled because Jackson never presented it to the circuit court. See Ex parte Coulliette, supra.
XI.
In its appellate brief, the State raised an issue regarding whether Jackson was erroneously retried and convicted on the two counts of attempted murder. Jackson argues that this issue is not properly before us. It is unnecessary to address the arguments presented in briefs.
Following the Supreme Court’s decision, we remanded the case to the circuit court, with the following directions:
“This Court unanimously affirmed Esaw Jackson’s convictions for three counts of capital murder and for two *939 counts of attempted murder and his resulting sentence of death for the capital-murder convictions and consecutive sentences of life imprisonment for the attempted-murder convictions. See Jackson v. State, 68 So.Bd 201 (Ala.Crim.App.2009). Jackson petitioned the Alabama Supreme Court for certiorari review. On September 24, 2010, the Alabama Supreme Court found that the ‘expression of anguish and the inseparable inadmissible opinion and victim-impact testimony’ by the victim’s mother rose to the level of plain error. Ex parte Jackson, 68 So.3d 211, 218 (Ala.2010). Thus, the Supreme Court reversed this Court’s judgment and remanded this case for this Court to remand it to the trial court for a new trial. Therefore, in accordance with the directions of the Alabama Supreme Court, the circuit court’s judgment is reversed, and this case is remanded for a new trial.”
Jackson v. State, 68 So.3d 218, 218-19 (Ala.Crim.App.2010). Though perhaps not a model of clarity, the remand instructions from this Court disclosed to the trial court that the Alabama Supreme Court found, on .certiorari review, that upon its plain-error review — which applies only to capital convictions — a reversible error pertaining to the capital convictions occurred during the trial. Thus, in accordance with directions from the Alabama Supreme Court, the case was remanded for a new trial as to the capital charges.[12] Therefore, in retrying the attempted-murder charges the circuit court exceeded the scope of our remand instructions.
“It is well settled that ‘any act by a trial court beyond the scope of an appellate court’s remand order is void for lack of jurisdiction.’ Anderson v. State, 796 So.2d 1151, 1156 (Ala.Crim.App.2000)(opinion after remand), citing Ellis v. State, 705 So.2d 843, 847 (Ala.Crim.App.1996)(stating that on remand, ‘the trial court had no jurisdiction to modify the original or base sentence imposed or to take any action beyond the express mandate of this court’).”
Smith v. State, 852 So.2d 185, 189-90 (Ala.Crim.App.2001).
Therefore, we reverse the circuit court’s November 28, 2011, convictions and sentences for attempted murder and again remand this cause to the circuit court with instructions to the circuit court to set aside those convictions and sentences and to reinstate Jackson’s February 2, 2007, convictions and sentences for attempted murder. Due return should be made to this court within 49 days.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH DIRECTIONS.*
WINDOM, P.J., and KELLUM, BURKE, and JOINER, JJ., concur. '

. The appellant’s first name also appears in the record as "Esau” and "Essau.” We will use the spelling used in the circuit court’s style of this case.

. The indictments against Jackson were not included in the instant record. However, this Court lakes judicial notice of the appellate record of Jackson’s first trial, which included the original indictments.

. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

. When explaining what items comprised the exhibit which was supposed to contain the spent shell casing, McDonald identified a "spent projectile.” (R. 281.) The identifica *917 tion of a spent shell casing must have been erroneous.

. Not to be confused with Jackson's nickname, which is also Wolf.

. Rector later clarified that the bullets were actually 30 caliber, which "is the English equivalent of [the] 7.62 [ammunition].” (R. 463.)

. CSI, Law and Order, and L.A. Law are television crime dramas popular when this case was tried.

. The prosecutor also quoted from Jackson’s first trial during which Torrence testified that Jackson had said that he and Pig were going to shoot the gun.

. As we noted earlier in this opinion, Jackson’s nickname was "Wolf.” 177 So.3d at 916.

. Jackson contends that this statement to the circuit court constituted an argument that Loretta “had a motive to lie.” (Jackson's brief, p. 32.) This contention is not supported by the record, which precludes Jackson from arguing that the line of questioning could have exposed a motive to lie on Loretta’s part. The record similarly precludes Jackson from arguing, as he does on page 31 of his brief, that the line of questioning would have demonstrated a bias held by Loretta. See Ex parte Coullielte, 857 So.2d at 794-95.

. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

. This Court affirmed Jackson’s convictions for attempted murder, and the Alabama Supreme Court did not grant certiorari review as to noncapital issues. Moreover, in footnote 5 of its opinion, the Alabama Supreme Court stated that “there is no issue before this Court concerning Jackson’s attempted-murder convictions.” Ex parte Jackson, 68 So.3d at 218 n. 5. Therefore, contrary to the finding by the circuit court, the Alabama Supreme Court’s certificate of judgment that listed in the style of the case the circuit court case number for each of Jackson’s five convictions, was not a reflection of that Court's review and decision as to the attempted-murder convictions.

 Note from the reporter of decisions: On April 25, 2014, on return to remand, the Court of *940 Criminal Appeals affirmed, without opinion. On May 2, 2014, on rehearing ex mero motu, the Court of Criminal Appeals withdrew its unpublished memorandum of April 25, 2014, and substituted another. On November 14, 2014, that court denied rehearing, without opinion. On March 13, 2015, the Supreme Court denied certiorari review, without opinion (1140198).